UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

STERLING ATKINS,

      Petitioner,

      v.

WILLIAM GITTERE, *et al.*,

      Respondents.

Case No. 2:02-cv-01348-JCM-BNW

**ORDER**

Introduction

      This action is a petition for a writ of habeas corpus by Sterling Atkins, a Nevada prisoner sentenced to death. The case is fully briefed and before the Court for adjudication of the merits of the claims remaining in Atkins' fourth amended habeas petition, and for resolution of Atkins' motion for an evidentiary hearing. The Court will deny Atkins' motion for an evidentiary hearing and will deny his petition.

Background Facts and Procedural History

      In its order on Atkins' direct appeal, the Nevada Supreme Court described the factual background of this case as follows:

> On January 16, 1994, the nude body of twenty-year-old Ebony Mason was discovered twenty-five feet from the road in an unimproved desert area of Clark County. The woman's body was found lying face down with hands extended overhead to a point on the ground where it appeared that some digging had occurred. A four-inch twig protruded from the victim's rectum. Three distinct types of footwear impressions were observed in the area as well as a hole containing a broken condom, a condom tip and an open but empty condom package.

> In the opinion of the medical examiner, Mason died from asphyxia due to strangulation and/or from blunt trauma to the head. The autopsy revealed nine broken ribs, multiple areas of external bruising, contusions, lacerations, abrasions, and a ligature mark on the anterior surface of the neck. Mason's body also bore a number of patterned contusions consistent with footwear impressions on the skin of the back and chest.

Finally, the autopsy revealed severe lacerations of the head and underlying hemorrhage within the skull indicating a blunt force trauma.

A police investigation led to the arrest of appellant Sterling Atkins, Jr. ("Atkins") and Anthony Doyle in Las Vegas, Nevada. Atkins' brother, Shawn Atkins ("Shawn"), was also arrested, but his arrest took place in Ohio by agents of the Federal Bureau of Investigation ("FBI"). Upon his arrest, Shawn gave a voluntary statement to the FBI regarding the events leading up to Mason's death on January 15, 1994. Shawn stated that after returning to Atkins' apartment from a party that night, he, Atkins, and Doyle encountered Ebony Mason, a mutual acquaintance, who was intoxicated and/or high on drugs. Mason agreed to accompany the men to Doyle's apartment to have sex with them. According to Shawn, Mason had consensual sex with Atkins and oral sex with Shawn, but she refused Doyle when he attempted to have anal sex with her. After these activities, Doyle agreed to drive Mason to downtown Las Vegas. Doyle drove a pick-up truck with Shawn, Atkins and Mason accompanying him, but instead of driving downtown, Doyle drove to a remote area in Clark County. Doyle was angry with Mason and demanded that she walk home. When she refused, Doyle stripped her clothes off and raped her as Shawn and Atkins watched, and then both Atkins and Doyle beat and kicked her until she died.

The State charged Doyle, Atkins and Shawn with one count each of murder, conspiracy to commit murder, robbery, first degree kidnapping and sexual assault. The State also filed a notice of intent to seek the death penalty. Thereafter, the district court granted Doyle's motion to sever trials and dismissed the robbery count against all three men. At a separate trial, commencing January 3, 1995, Doyle was convicted on all counts and sentenced to death for the murder. *See Doyle v. State*, 112 Nev. 879, 921 P.2d 901 (1996).

On February 13, 1995, prior to trial, Shawn entered into a plea bargain agreement wherein he pleaded guilty to first-degree murder and first-degree kidnapping and was sentenced to two concurrent life sentences with the possibility of parole. As part of the bargain, Shawn agreed to testify at Atkins' trial.

On March 20, 1995, Atkins' jury trial commenced.  As the State's only eyewitness, Shawn testified that Atkins was not involved in Mason's beating and murder, but the State impeached Shawn with his prior inconsistent statements to the FBI and to witness Mark Wattley. At the conclusion of the guilt phase of the trial on March 30, 1995, the jury found Atkins guilty of murder, conspiracy to commit murder, first-degree kidnapping and sexual assault. At the conclusion of the penalty phase, the jury sentenced Atkins to death for the murder conviction.

*Atkins v. State*, 112 Nev. 1122, 1125–26, 923 P.2d 1119, 1121–22 (1996)

(Respondents filed a copy of the opinion as Exh. 189 (ECF No. 93-12)). The judgment

of conviction was entered on June 8, 1995. *See* Judgment of Conviction, Exh. 159 (ECF

No. 92-21). Atkins was sentenced to death for the first-degree murder, a consecutive

sentence of six years in prison for the conspiracy to commit murder, a consecutive

sentence of life in prison without the possibility of parole for the first-degree kidnapping, and a consecutive sentence of life in prison without the possibility of parole for the sexual assault. *See id.*

Atkins appealed. On August 28, 1996, the Nevada Supreme Court reversed the sexual assault conviction, but affirmed the convictions of first-degree murder, conspiracy to commit murder, and first-degree kidnapping, as well as the death sentence. *See Atkins*, 112 Nev. at 1137, 923 P.2d at 1129. The Nevada Supreme Court denied rehearing on October 17, 1996. *See* Order Denying Rehearing, Exh. 195 (ECF No. 93-18). The United States Supreme Court denied certiorari on March 17, 1997. *See Atkins v. Nevada*, 520 U.S. 1126 (1997). The amended judgment of conviction, reflecting the reversal of the sexual assault conviction, was entered on April 30, 1997. *See* Amended Judgment of Conviction, Exh. 216 (ECF No. 93-39).

On April 18, 1997, Atkins filed a petition for writ of habeas corpus in the state district court. *See* Petition for Post-Conviction Relief, Exh. 211 (ECF No. 93-34); *see also* Supplemental Brief in Support of Petition, Exh. 232 (ECF No. 94-13). The state district court heard argument of counsel (Transcript of Proceedings, Exhs. 235, 236 (ECF Nos. 94-16, 94-17) and then denied the petition in an order filed on January 4, 2001. *See* Findings of Fact, Conclusions of Law and Order, Exh. 237 (ECF No. 94-18). Atkins appealed, and the Nevada Supreme Court affirmed on May 14, 2002. *See* Order of Affirmance, Exh. 261 (ECF No. 94-43).

Atkins initiated this federal habeas corpus action on October 11, 2002, by filing a pro se petition for writ of habeas corpus (ECF No. 1). Counsel was appointed for Atkins, and, with counsel, on May 19, 2005, Atkins filed what his counsel termed a "supplemental petition" (ECF No. 32). On December 10, 2007, Atkins filed a first amended petition (ECF No. 69), and on October 29, 2008, he filed a second amended petition (ECF No. 85).

Respondents filed a motion to dismiss on January 23, 2009 (ECF No. 88). The Court ruled on that motion on August 18, 2009 (ECF No. 105), dismissing certain of

Atkins' claims, and finding certain of his claims unexhausted in state court. Atkins moved for a stay to allow him to exhaust his unexhausted claims in state court (ECF No. 108). The Court granted that motion and stayed the case (ECF Nos. 116, 119), and granted Atkins leave to file a third amended petition (ECF Nos. 116, 117).

On November 4, 2009, Atkins initiated a second state habeas action. *See* Petition for Writ of Habeas Corpus (Post-Conviction), Exh. 283 (ECF No. 194-20). On March 22, 2012, the state district court dismissed that petition. *See* Findings of Fact, Conclusions of Law and Order, Exh. 289 (ECF No. 194-26). Atkins appealed, and on April 23, 2014, the Nevada Supreme Court affirmed, ruling that the claims asserted by Atkins in his second state habeas action were untimely filed under NRS 34.726, barred by laches under NRS 34.800, and successive and an abuse of the writ under NRS 34.810. *See* Order of Affirmance, Exh. 307 (ECF No. 195-17). The Nevada Supreme Court denied Atkins' petition for rehearing. *See* Order Denying Rehearing, Exh. 312 (ECF No. 195-22).

The stay of this action was lifted on January 19, 2015 (ECF No. 145), and Atkins filed a fourth amended petition for writ of habeas corpus—now the operative petition— on August 26, 2016 (ECF No. 183). In his fourth amended petition, Atkins asserts the following claims:

> 1(a).   Atkins' federal constitutional rights were violated as a result of ineffective assistance of his trial counsel because his counsel "proceed[ed] to trial despite the fact that first chair counsel had been appointed only five days prior to trial and co-counsel was newly-admitted to the Nevada Bar and this was his first jury trial."
>
> 1(b).   Atkins' federal constitutional rights were violated as a result of ineffective assistance of his trial counsel because of "ineffective assistance of counsel in *voir dire* and jury selection."
>
> 1(c).   Atkins' federal constitutional rights were violated because his trial counsel were ineffective "for failure to assert a *Batson* challenge to the State's removal of Mr. Long, the only remaining African-American in the jury pool."
>
> 1(d).   Atkins' federal constitutional rights were violated because his trial counsel were ineffective "for failure to argue that the trial court committed reversible error by excusing [Prospective Juror Number 1] ... and failure to question him regarding his attitude on the death penalty."

4

1(e).   Atkins' federal constitutional rights were violated as a result of ineffective assistance of his trial counsel because of "cumulative ineffective assistance of counsel at the pre-trial phase."

2.   Atkins' federal constitutional rights were violated because his trial counsel were ineffective "for failing to investigate and present evidence of Mr. Atkins' incompetency to stand trial."

3(a).   Atkins' federal constitutional rights were violated because his trial counsel were ineffective "for failing to investigate and present psychological evidence at the guilt phase of the trial."

3(b).   Atkins' federal constitutional rights were violated because his trial counsel were ineffective "for suggesting that Atkins 'jumped in' to the killing of Ebony Mason."

3(c).   Atkins' federal constitutional rights were violated because his trial counsel were ineffective "for testifying instead of questioning."

3(d).   Atkins' federal constitutional rights were violated because his trial counsel were ineffective "for denigrating the victim and terming her a 'hood rat.'"

3(e).   Atkins' federal constitutional rights were violated because his trial counsel were ineffective "for failure to timely object to irrelevant and prejudicial evidence from the victim's father."

3(f).   Atkins' federal constitutional rights were violated because his trial counsel were ineffective "for emphasizing on cross-examination that there were three patterns of footwear."

3(g).   Atkins' federal constitutional rights were violated because his trial counsel were ineffective "for failure to present a shoe impression expert."

3(h).   Atkins' federal constitutional rights were violated because his trial counsel were ineffective "for failure to obtain an independent hair analysis expert."

3(i).   Atkins' federal constitutional rights were violated because his trial counsel were ineffective for "failure to impeach three key prosecution witnesses."

3(j).   Atkins' federal constitutional rights were violated as a result of ineffective assistance of his trial counsel because of "cumulative ineffective assistance of counsel at the guilt phase."

4(a).   Atkins' federal constitutional rights were violated as a result of ineffective assistance of his trial counsel because his "trial counsel unreasonably failed to retain and supervise appropriate investigators and other staff to conduct an adequate and timely investigation."

4(b).   Atkins' federal constitutional rights were violated as a result of ineffective assistance of his trial counsel because his "trial counsel failed to investigate and present readily available and substantially mitigating social history evidence."

4(c).   Atkins' federal constitutional rights were violated because his trial counsel were ineffective for "emphasizing [Atkins'] failure in prison and on parole."

4(d).   Atkins' federal constitutional rights were violated because his trial counsel were ineffective for "not objecting to extensive testimony regarding parole."

4(e).   Atkins' federal constitutional rights were violated because his trial counsel were ineffective for "eliciting harmful information from defense prison expert Mr. Hardin."

4(f).   Atkins' federal constitutional rights were violated because his trial counsel were ineffective "for failure to challenge any of the six aggravating circumstances."

4(g).   Atkins' federal constitutional rights were violated because his trial counsel were ineffective "in the preparation and presentation of defense expert Dr. Colosimo."

4(h).   Atkins' federal constitutional rights were violated as a result of ineffective assistance of his trial counsel because of "cumulative ineffective assistance of counsel at the punishment phase."

5.   Atkins' federal constitutional rights were violated because "lead counsel had a conflict of interest with her client that caused her to fail to request a continuance."

6.   Atkins' federal constitutional rights were violated because of "prosecutorial misconduct under *Brady v. Maryland* and *Giglio v. United States* by failing to disclose deals made with the principal State's witnesses."

7(a).   Atkins' federal constitutional rights were violated because "the trial court erred in denying defense counsels' motion challenging the composition of the jury pool and Mr. Atkins' conviction" and because of "under representation of African-Americans in the jury pool and on his jury."

7(b).   Atkins' federal constitutional rights were violated because "the trial court erred in allowing hearsay statements made by Shawn Atkins to State's witness Mark Wattley."

7(c).   Atkins' federal constitutional rights were violated because "the trial court erred in not allowing the defense a continuance."

7(d).   Atkins' federal constitutional rights were violated because "the trial court committed reversible error by excusing juror number one, Mr. Corcoran and failing to further question him regarding his attitude on the death penalty."

7(e).   Atkins' federal constitutional rights were violated on account of "trial court error for failing to grant a full an adequate competency hearing."

7(f).    Atkins' federal constitutional rights were violated on account of "trial court error for allowing prosecutorial misconduct in final punishment phase argument and prosecutorial misconduct for the argument."

8.    Atkins' federal constitutional rights were violated "because the prosecution used a racially-motivated peremptory challenge to exclude the only remaining African-American from the jury.

9.    Atkins' federal constitutional rights were violated because "Nevada's unconstitutional common law definitions of the elements of the capital offense are unconstitutional and many of the aggravating factors were invalid."

10.    Atkins' federal constitutional rights were violated because "the trial court erred in allowing the jury to speculate that Atkins could be paroled or granted clemency if he received a sentence of life without the possibility of parole.

11.    Atkins' federal constitutional rights were violated because "the trial court gave an incorrect definition of reasonable doubt which lowered the State's burden of proof."

12.    Atkins' federal constitutional rights were violated because "the definition of 'premeditation and deliberation' given [to Atkins'] jury was unconstitutional."

13.    Atkins' federal constitutional rights were violated as a result of ineffective assistance of his appellate counsel.

14.    Atkins' federal constitutional rights were violated because "the trial court erred in admitting irrelevant, cumulative and prejudicial victim impact evidence at the guilt and penalty phases of the trial."

15.    Atkins' federal constitutional rights were violated because his trial "was conducted before judges who were popularly elected."

16.    "The Nevada system of execution by lethal injection is unconstitutional."

17.    Atkins' "sentence is unconstitutional due to the failure of the Nevada Supreme Court to conduct fair and adequate appellate review."

18.    Atkins' death sentence is in violation of the federal constitution because "the Nevada capital punishment system is arbitrary and capricious."

19.    Atkins' death sentence is in violation of the federal constitution because "the death penalty is cruel and unusual punishment."

20.    Atkins' "conviction and sentence violate international law and the International Covenant on Civil and Political Rights."

21.    Atkins' death sentence is in violation of the federal constitution because "the execution of a death sentence after keeping the condemned on death row for an inordinate amount of time constitutes cruel and unusual punishment."

22.     Atkins' federal constitutional rights were violated because "the cumulative effect of errors undermined the fundamental fairness of the trial and the reliability of the death judgment."

23.     Atkins' death sentence is in violation of the federal constitution because Atkins "may become incompetent to be executed."

24.     Atkins' federal constitutional rights were violated because Atkins "is actually innocent of capital murder."

Fourth Amended Petition (ECF No. 183), pp. 91–330 (capitalization and punctuation altered in quotations of headings).

On December 22, 2016, Respondents filed a motion to dismiss (ECF No. 192), arguing that various of Atkins' claims are barred by the statute of limitations, unexhausted in state court, procedurally defaulted, and not cognizable in this federal habeas corpus action. In an order filed on September 28, 2017, the Court granted that motion in part and denied it in part. The Court dismissed Claims 1(b), 1(c), 3(b), 3(c), 3(d), 3(h), 4(c), 4(d), 4(e), 4(f), 8, 9 (in part), 13 (in part), 15 and 24 on the ground that they are barred by the statute of limitations, and Claim 23 on the ground that it is not cognizable in this action. In all other respects the Court denied the motion. The Court determined that, as the question of the procedural default of Atkins' claims involves consideration of the merits of the claims, those issues would be better addressed after Respondents filed their answer and Atkins his reply. Therefore, the Court's ruling on the motion to dismiss was without prejudice to Respondents reasserting their procedural default defenses in their answer.

The respondents filed an answer, responding to Atkins' remaining claims, on April 13, 2018 (ECF No. 219). Atkins filed a reply on September 7, 2018 (ECF No. 222). Respondents filed a response to Atkins' reply on January 18, 2019 (ECF No. 231).

Along with his reply, on September 7, 2018, Atkins filed a motion for an evidentiary hearing (ECF No. 223). Respondents filed an opposition to that motion on January 18, 2019 (ECF No. 230). Atkins did not reply.

Discussion

Standard of Review

Because this action was initiated after April 24, 1996, the amendments to 28 U.S.C. § 2254 enacted as part of the Antiterrorism and Effective Death Penalty Act (AEDPA) apply. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Van Tran v. Lindsey*, 212 F.3d 1143, 1148 (9th Cir. 2000), overruled on other grounds by *Lockyer v. Andrade*, 538 U.S. 63 (2003). 28 U.S.C. § 2254(d) sets forth the primary standard of review under the AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be

objectively unreasonable. *Id.* (*quoting Williams*, 529 U.S. at 409). The analysis under section 2254(d) looks to the law that was clearly established by United States Supreme Court precedent at the time of the state court's decision. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has also instructed that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (AEDPA standard is "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

The state courts' "last reasoned decision" is the ruling subject to section 2254(d) review. *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010). When a state appellate court does not provide an explanation for its decision, the federal habeas court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *see also Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991) (the federal court may look through to the last reasoned state court decision).

Where the state court summarily denied a claim but there is no reasoned state-court decision on the claim, a presumption exists that the state court adjudicated the claim on the merits, unless "there is reason to think some other explanation for the state court's decision is more likely." *Richter*, 562 U.S. at 99–100. In that case, a reviewing federal court "must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible

1  fairminded jurists could disagree that those arguments or theories are inconsistent with
2  the holding in a prior decision of [the Supreme] Court." *Id.* at 102.

3      In considering a habeas petitioner's claims under section 2254(d), the federal
4  court takes into account only the evidence presented in state court. *Pinholster*, 563 U.S.
5  at 185–87.

6      The federal court's review is de novo for claims not adjudicated on their merits by
7  the state courts. *See Cone v. Bell*, 556 U.S. 449, 472 (2009); *Porter v. McCollum*, 558
8  U.S. 30, 39 (2009).

9      <u>Procedural Default and *Martinez*</u>

10     In *Coleman v. Thompson*, 501 U.S. 722 (1991), the Supreme Court held that a
11 state prisoner who fails to comply with the state's procedural requirements in presenting
12 claims is barred by the adequate and independent state ground doctrine from obtaining
13 a writ of habeas corpus in federal court. *Coleman*, 501 U.S. at 731–32 ("Just as in those
14 cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who
15 has failed to meet the State's procedural requirements for presenting his federal claims
16 has deprived the state courts of an opportunity to address those claims in the first
17 instance."). Where such a procedural default constitutes an adequate and independent
18 state ground for denial of habeas corpus, the default may be excused only if "a
19 constitutional violation has probably resulted in the conviction of one who is actually
20 innocent," or if the prisoner demonstrates cause for the default and prejudice resulting
21 from it. *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

22     To demonstrate cause for a procedural default, the petitioner must "show that
23 some objective factor external to the defense impeded" his efforts to comply with the
24 state procedural rule. *Murray*, 477 U.S. at 488. For cause to exist, the external
25 impediment must have prevented the petitioner from raising the claim. *See McCleskey*
26 *v. Zant*, 499 U.S. 467, 497 (1991). With respect to the prejudice prong, the petitioner
27 bears "the burden of showing not merely that the errors [complained of] constituted a
28 possibility of prejudice, but that they worked to his actual and substantial disadvantage,

1    infecting his entire [proceeding] with errors of constitutional dimension." *White v. Lewis*,

2    874 F.2d 599, 603 (9th Cir. 1989), citing *United States v. Frady*, 456 U.S. 152, 170

3    (1982).

4            In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court ruled that ineffective

5    assistance of post-conviction counsel may serve as cause to overcome the procedural

6    default of a claim of ineffective assistance of trial counsel. The *Coleman* Court had held

7    that the absence or ineffective assistance of state post-conviction counsel generally

8    could not establish cause to excuse a procedural default because there is no

9    constitutional right to counsel in state post-conviction proceedings. *See Coleman*, 501

10   U.S. at 752–54. In *Martinez*, however, the Supreme Court established an equitable

11   exception to that rule, holding that the absence or ineffective assistance of counsel at

12   an initial-review collateral proceeding may establish cause to excuse a petitioner's

13   procedural default of substantial claims of ineffective assistance of trial counsel. *See*

14   *Martinez*, 566 U.S. at 9. The Court described "initial-review collateral proceedings" as

15   "collateral proceedings which provide the first occasion to raise a claim of ineffective

16   assistance at trial." *Id.* at 8.

17          In the September 28, 2017, order, the Court observed that, on the appeal in

18   Atkins' first state habeas action, the Nevada Supreme Court ruled that certain of his

19   claims—claims other than ineffective assistance of counsel claims—were procedurally

20   barred under state law because Atkins did not raise those claims on his direct appeal.

21   *See* Order filed September 28, 2017 (ECF No. 214), pp. 11–12. Those claims are

22   subject to application of the procedural default doctrine in this case.

23          In the September 28, 2017, order, the Court also observed that, in Atkins' second

24   state habeas action, the Nevada Supreme Court ruled that his entire petition was

25   procedurally barred under state law, and, therefore, claims exhausted by Atkins in state

26   court only in his second state habeas action are also subject to application of the

27   procedural default doctrine. *See id.* at 12.

28

In addition, in the September 28, 2017, order, the Court pointed out that the Supreme Court has recognized that under certain circumstances it may be appropriate for a federal court to anticipate the state-law procedural bar of an unexhausted claim, and to treat such a claim as subject to the procedural default doctrine. *See id.* at 10–11. "An unexhausted claim will be procedurally defaulted, if state procedural rules would now bar the petitioner from bringing the claim in state court." *Id.* (quoting *Dickens v. Ryan*, 740 F.3d 1302, 1317 (9th Cir. 2014) (citing *Coleman*, 501 U.S. at 731)).

In the September 28, 2017, order, the Court ruled that, under *Martinez*, Atkins might be able to overcome certain of his procedural defaults, but the Court declined to rule on the question of the procedural defaults until the merits of the claims were briefed. *See id.* at 12.

<u>Standards Governing Claims of Ineffective Assistance of Counsel</u>

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court propounded a two-part test for analysis of claims of ineffective assistance of counsel: the petitioner must demonstrate (1) that the attorney's representation "fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. A court considering a claim of ineffective assistance of counsel must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. To establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state court previously adjudicated a claim of ineffective assistance of counsel under *Strickland*, establishing that the state court's decision was unreasonable is especially difficult. *See Richter*, 562 U.S. at 104–05. In *Richter*, the Supreme Court instructed:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," [*Strickland*, 466 U.S. at 689]; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*, 556 U.S. 111, 123 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as 'doubly deferential.' [*Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (per curiam)].").

Claim 1(a)

In Claim 1(a), Atkins claims that his federal constitutional rights were violated as a result of ineffective assistance of his trial counsel because his counsel "proceed[ed] to trial despite the fact that first chair counsel had been appointed only five days prior to trial and co-counsel was newly-admitted to the Nevada Bar and this was his first jury trial." Fourth Amended Petition (ECF No. 183), pp. 91–99.

Prior to trial and through the trial, Atkins was represented by three attorneys: Anthony Sgro, Laura Melia (now Laura Murry) and Kent Kozal. During the time leading up to, and at, Atkins' preliminary hearing, Atkins was represented by Sgro and Melia. *See* Minutes of the Justice Court, Exh. 1 (ECF No. 89-2); Transcript of Preliminary Hearing, Exhs. 20, 21 (ECF Nos. 21, 22, 23 and 24). Melia was then an associate in Sgro's office. After the preliminary hearing, which was conducted on May 19 and 20, 1994, Melia apparently left Sgro's employment, and was replaced on Atkins' case by

Kozal. Later, as the trial approached, on May 15, 1995, as a result of a scheduling conflict on the part of Sgro, Sgro was allowed to withdraw, and Melia returned to the case, in Sgro's place, as lead counsel for Atkins. Atkins' trial commenced on May 20, 1995, with Atkins represented by Melia and Kozal. *See* Fourth Amended Petition (ECF No. 183), pp. 92–94. Atkins claims that his trial counsel proceeding to trial under those circumstances, with Melia back on his case for only five days before the start of the trial, amounted to ineffective assistance of counsel. *See id*.

Specifically, regarding the effect of his counsel proceeding to trial under these circumstances, Atkins claims:

> This rush to trial resulted in the failure of trial counsel, *inter alia*, to timely investigate, to timely prepare penalty phase witnesses, to fail to impeach State's witness with their contradictory testimony in the co-defendant's trial, to present evidence of Atkins' innocence of the crime, and present psychological evidence of Atkins' competency to stand trial. As a result, no psychological evidence was presented at the guilt phase of his trial, although there was abundant evidence of his incompetency and his inability to make a reasoned decision to proceed to trial instead of accepting a plea to a life sentence which was offered. This failure and defense counsels' unpreparedness also resulted in the disastrous presentation of Dr. Colosimo's testimony at the penalty phase.

> * * *

> Additional consequences of the failure to request a continuance were ineffective assistance at *voir dire* and in the selection of the jury and at all phases of the trial.

> * * *

> The record shows many examples of deficient performance, discussed in more detail in the numerous claims and sub-claims of ineffective assistance of counsel that follow this claim. In summary they include, but are not limited to: 1) inadequate time to review the juror questionnaires and prepare *voir dire*; 3) [sic] completely inadequate jury selection, discussed in detail in the following sub-claim; 4) the failure to mount a *Batson* challenge to the State's dismissal of the one remaining African-American juror; 5) inadequate time to prepare cross-examination of the State's witnesses and direct examination of the defense witnesses, 6) failure to impeach key State's witness on inconsistent testimony in the co-defendant *Doyle*'s case which had just concluded; 7) failure to timely assess Mr. Atkins' competency, which resulted in the holding of a competency hearing after the trial had commenced; 8) failure to present any witnesses at the guilt phase of the trial or present Mr. Atkins' case for innocence; 9) attacking the victim's sexual habits by using a derogatory term, which led to damaging victim impact evidence at the guilt phase; 10) failure to competently present expert testimony of Dr. Colosimo;

11) failure to present readily available mitigating evidence of Atkins' deprived background and parental abuse; 12) failure to argue against any of the six alleged aggravating circumstances, which doomed Mr. Atkins' chance for a life sentence.

\* \* \*

The prejudice component of *Strickland* is evident here as the direct result of the deficient performances of the defense outlined above. It includes:

1) the seating of a biased jury, as discussed in the following sub-claim;

2) the failure to assert a *Batson* challenge to the State's dismissal of the last remaining African-American meant that there were no African-Americans left on Mr. Atkins' jury;

3) Ms. Melia's unpreparedness in attacking the victim led to the disaster of the victim's father testifying at the guilt phase, which would have been otherwise inadmissible;

4) the failure to request a timely competency hearing until the trial had already begun led to the court's circumscribing that hearing (to the sole issue of Atkins' competency to reject a plea deal);

5) the failure to properly prepare Dr. Colosimo led to damaging testimony at the penalty phase, such as that Atkins lacked remorse and was self-centered;

6) counsels' unfamiliarity with the case led to their otherwise inexplicable failure to impeach key state's witnesses on their inconsistent testimony in the recently-completed trial of the co-defendant Anthony Doyle;

7) counsels' failure to challenge any of the six aggravating circumstances led to the jury finding them all to be true, despite a lack of evidence as to most of them.

*Id.* at 91–92, 98–99.

The Court reads Claim 1(a) as providing explanation and support for other claims of ineffective assistance of counsel in Atkins' petition. To the extent that in Claim 1(a) Atkins seeks relief for the ineffective assistance of trial counsel alleged in other more specific and more detailed claims, Claim 1(a) is repetitive and redundant, and unnecessary as a separate claim.

Viewed slightly differently, as Respondents point out (*see* Response to Reply (ECF No. 231), p. 10), Claim 1(a) is essentially a cumulative error claim, incorporating allegations presented in other claims throughout Atkins' petition. As such, it is repetitive

and redundant of Claims 1(e), 3(j), 4(h) and 22, Atkins' other cumulative error claims, and, again, it is unnecessary as a separate claim.

The Court will deny Atkins habeas corpus relief on Claim 1(a) but will consider the allegations made by Atkins in Claim 1(a) in reviewing Atkins' other claims of ineffective assistance of trial counsel and his other cumulative error claims.

### Claims 1(d) and 7(d), and the Related Part of Claim 13

In Claim 1(d), Atkins claims that his federal constitutional rights were violated because his trial counsel were ineffective "for failure to argue that the trial court committed reversible error by excusing [Prospective Juror Number 1] ... and failure to question him regarding his attitude on the death penalty." Fourth Amended Petition (ECF No. 183), pp. 123–28. In Claim 7(d), Atkins claims that his federal constitutional rights were violated because "the trial court committed reversible error by excusing [Prospective Juror Number 1] and failing to further question him regarding his attitude on the death penalty." *Id.* at 217–20. And, in Claim 13, Atkins appears to claim that his appellate counsel was ineffective, in part, for not asserting a claim such as Claim 7(d) on his direct appeal. *Id.* at 293–94.

Prospective Juror Number 1 was the first prospective juror questioned. *See* Transcript of Trial, March 20, 1995, Exh. 121, pp. 3207–21 (ECF No. 91-22, pp. 20–34). Early on, under questioning by the trial judge, the following exchange occurred:

> THE COURT:  Do you have any conscientious, moral or religious objections to the imposition of the death penalty?
>
> PROSPECTIVE JUROR NO. 1:  I never considered – I don't know if my religion is against it or not, so I may seek a little counseling on that.
>
> THE COURT:  Would you mind explaining, sir?
>
> PROSPECTIVE JUROR NO. 1:  Well, I don't – I've never been asked that before, and I profess to Catholic faith, and I don't know if the Catholic faith accepts the death penalty or not.

*Id.* 3213 (ECF No. 92-22, p. 26). Later in the questioning of Prospective Juror Number 1, the following exchange took place:

MR. SCHWARTZ [Prosecutor]:  ... Sir, without prying into your religious beliefs, aside from your religious convictions, is there anything about the death penalty that personally causes you a problem, personal belief?

PROSPECTIVE JUROR NO. 1:  Well, yes, a little bit.

MR. SCHWARTZ:  Okay. Could you explain what gives you a problem with regard to the death penalty?

PROSPECTIVE JUROR NO. 1:  Well, a little bit in that – and it's probably related to the religion that a person [can] always change and, you know, has another chance.

MR. SCHWARTZ:  Okay. If you were selected as a member of this jury, and you believe that the State had proven the Defendant guilty of first-degree murder, and you and your fellow jurors announced that verdict in court and then you participated in the penalty phase, when again it's like a second trial – you'd hear testimony of witnesses, the attorneys would argue to the jury – and you would determine whether or not the Defendant should be sentenced [to] life imprisonment with parole, life imprisonment without parole or the death penalty, you'd have three options. If you were in that situation you felt the nature of the crime and what you had heard, the only appropriate punishment for this particular crime would be one of death, because of what you just told me, do you think you would automatically say, "I just can't do it. Anybody can change; I'm not going to vote for the death penalty. Under circumstances can I, myself do that." We have to know now. Once we select a jury it's too late.

PROSPECTIVE JUROR NO. 1:  If I was ...

MR. SCHWARTZ:  If you were the State and you were seeking the death penalty, would you want twelve individuals like yourself?

PROSPECTIVE JUROR NO. 1:  No, I wouldn't, sir.

MR. SCHWARTZ:  Under any circumstances, do you think you could come into a courtroom and pronounce a death sentence on an individual?

PROSPECTIVE JUROR NO. 1:  No, sir, I don't think I could.

MR. SCHWARTZ:  We challenge for cause, your Honor.

THE COURT:  Traverse?

MR. KOZEL [defense counsel]:  ... [E]arlier we talked about you may have a problem sentencing someone to death based upon your religion. Is that still the basis for your feelings?

PROSPECTIVE JUROR NO. 1:  Yes, because the way I was raised, and I profess these, that when it came down to it I don't think I could probably vote for the death penalty.

MR. KOZEL:  After listening to all the evidence for and against, all the aggravating and all the mitigating circumstances, under no situation could you vote for the death penalty?

PROSPECTIVE JUROR NO. 1:  No, I don't think I could.

MR. KOZEL:  Nothing further, your Honor.

THE COURT:  Thank you.... You are excused. Report back to the jury room for further instructions.

*Id.* at 3219–21 (ECF No. 91-22, pp. 32–34).

In his first state habeas action, Atkins asserted the claims of ineffective assistance of trial and appellate counsel—that his trial counsel was ineffective for not opposing the excusal of this juror, and that his appellate counsel was ineffective for not asserting on his direct appeal a claim that the excusal of the prospective juror was erroneous. *See* Appellant's Opening Brief, Exh. 256, pp. 24–28 (ECF No. 94-37, pp. 40–44). The Nevada Supreme Court ruled as follows on those claims:

... Atkins contends that his trial and appellate counsel were ineffective in failing to challenge the district court's excusal of a prospective juror because it was not "unmistakably clear" that he would automatically vote against the imposition of death. We disagree. At the end of a lengthy voir dire, the prospective juror indicated that he could not, under any circumstances, vote for the death penalty. We conclude that the district court properly excused the prospective juror and that Atkins' trial and appellate counsel were not ineffective for failing to object to the excusal.

Order of Affirmance, Exh. 261, p. 5 (ECF No. 94-43, p. 6). In a footnote, the Nevada Supreme Court cited, as follows, the United States Supreme Court's holding in *Wainwright v. Witt*, 469 U.S. 412 (1985):

*See Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (holding that "the proper standard for determining when a prospective juror can be excluded because of his or her views on capital punishment ... [i]s whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'") (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)[)].

*Id.* at p. 5 n.11 (ECF No. 94-43, p. 6 n.11).

The Nevada Supreme Court accurately pointed to *Wainwright* as stating the standard for whether a juror may be excused because of his or her beliefs in opposition to the death penalty: "whether the juror's views would 'prevent or substantially impair

the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright*, 469 U.S. at 424. Potential jurors must be dismissed from the juror pool where they make it "'unmistakably clear' that they could not be trusted to 'abide by existing law' and 'to follow conscientiously the instructions' of the trial judge." *Lockett v. Ohio*, 438 U.S. 586, 595–596 (1978) (quoting *Boulden v. Holman*, 394 U.S. 478, 484 (1969)). The jury must be comprised of individuals who "will consider and decide the facts impartially and conscientiously apply the law as charged by the court." *Adams*, 448 U.S. at 45.

Applying *Strickland* and affording the Nevada Supreme Court's ruling the deference mandated by 28 U.S.C. § 2254(d)(1), this Court will deny Atkins relief on these claims of ineffective assistance of counsel concerning the excusal of Prospective Juror Number 1. The Nevada Supreme Court's ruling, that the excusal of the prospective juror was proper and that Atkins' counsel were not ineffective for failing to challenge his excusal, was reasonable.

The substantive claim in Claim 7(d)—that the trial court violated Atkins' federal constitutional rights by excusing Prospective Juror Number 1—is subject to dismissal under the procedural default doctrine. Atkins first asserted this claim in his first state habeas action, and the Nevada Supreme Court ruled it procedurally barred under state law. *See* Appellant's Opening Brief, Exh. 256, pp. 24–28 (ECF No. 94-37, pp. 40–44); Order of Affirmance, Exh. 261, p. 1 n.2 (ECF No. 94-43, p. 2 n.2) ("To the extent that Atkins raises independent constitutional claims, they are waived because they were not raised on direct appeal. *See* NRS 34.810(1)(b)."). Atkins does not show cause and prejudice relative to the procedural default; his appellate counsel was not ineffective for not asserting the claim on his direct appeal. Claim 7(d) will be denied as procedurally defaulted.

Claim 1(e)

In Claim 1(e), Atkins claims that his federal constitutional rights were violated as a result of ineffective assistance of his trial counsel because of "cumulative ineffective

1  assistance of counsel at the pre-trial phase." Fourth Amended Petition (ECF No. 183),

2  p. 128. This is a cumulative error claim covering the ineffective assistance counsel

3  claims in Claims 1(a), 1(b), 1(c) and 1(d); as the Court does not find ineffective

4  assistance of trial counsel as alleged in any of those claims, there is no ineffective

5  assistance of counsel to be considered cumulatively, and Claim 1(e) fails. The Court will

6  deny Atkins habeas corpus relief relative to Claim 1(e).

7         <u>Claims 2 and 7(e), and the Related Part of Claim 13</u>

8         In Claim 2, Atkins claims that his federal constitutional rights were violated

9  because his trial counsel were ineffective "for failing to investigate and present evidence

10  of Mr. Atkins' incompetency to stand trial." Fourth Amended Petition (ECF No. 183), pp.

11  129–39. In Claim 7(e), Atkins claims that his federal constitutional rights were violated

12  on account of "trial court error for failing to grant a full and adequate competency

13  hearing." *Id.* at 221–22. And, in Claim 13, Atkins appears to claim that his appellate

14  counsel was ineffective, in part, for not asserting the claim in Claim 7(e) on his direct

15  appeal. *Id.* at 293–94.

16         The conviction of a legally incompetent person violates due process, and where

17  the evidence raises a "bona fide doubt about" the defendant's competency, due process

18  requires that a full competency hearing be held. *See Pate v. Robinson*, 383 U.S. 375,

19  385 (1966). The test for competency is "whether [the defendant] has sufficient present

20  ability to consult with his lawyer with a reasonable degree of rational understanding—

21  and whether he has a rational as well as factual understanding of the proceedings

22  against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam); *see also*

23  *Clark v. Arnold*, 769 F.3d 711, 729 (9th Cir. 2014). A hearing is required where there is

24  "substantial evidence" giving rise to a "bona fide" doubt about the defendant's

25  competence. *See Davis v. Woodford*, 384 F.3d 628, 644 (9th Cir. 2004).

26         Atkins asserted these claims on the appeal in his first state habeas action. *See*

27  Appellant's Opening Brief, Exh. 256, pp. 13–19, 40–42, 66 (ECF No. 94-37, pp. 29–35,

28  56–58, and ECF No. 94-38, p. 19).

The Nevada Supreme Court ruled on the ineffective assistance of counsel claims as follows:

Atkins first claims that his trial counsel failed to adequately investigate Atkins' mental status. Atkins also alleges that his trial attorneys erred by failing to introduce evidence of his mental infirmities at the guilt phase of his trial to defend against premeditation. Atkins is not entitled to relief on these claims. First, pursuant to defense counsel's request, Atkins met with clinical psychologist Dr. Philip Colosimo six times. Dr. Colosimo conducted psychological testing of Atkins on three of those occasions, and estimated that he spent a total of nine hours with him. Dr. Colosimo provided defense counsel with his written report and testified at Atkins' penalty hearing in mitigation of punishment. Atkins has not indicated what material evidence would have been discovered through additional investigation into his mental status or how that evidence would have affected the outcome of his trial. Second, Dr. Colosimo explicitly concluded in his report that Atkins was competent at the time he committed the crimes. We therefore conclude that the record repels Atkins' claims that his trial counsel's investigation or use of psychological evidence was objectively unreasonable and that he was prejudiced.

Next, Atkins contends that his trial counsel failed to timely move for a competency hearing and thereafter improperly withdrew the allegedly untimely motion. In support of these claims, Atkins states that his trial attorneys filed their motion two days prior to trial and cites (1) a letter received by defense counsel from Dr. Colosimo stating that Atkins suffers from various psychological infirmities; (2) Atkins' belief that a second death sentence could not be imposed for the murder of the single victim in this case [Footnote: In a severed trial that preceded Atkins', co-defendant Anthony Lavon Doyle was found guilty of, inter alia, first-degree murder and was sentenced to death. *See Doyle v. State*, 112 Nev. 879, 884, 921 P.2d 901, 905 (1996).]; and (3) his summary rejection of a proffered plea bargain involving a sentence less than death. We conclude that Atkins has failed to establish that he was incompetent, or that a competency hearing would have been required had the issue been maintained. [Footnote: *See Melchor-Gloria v. State*, 99 Nev. 174, 180, 660 P.2d 109, 113 (1983) (competency hearing required where substantial evidence shows that a defendant may be mentally incompetent to stand trial).] First, Dr. Colosimo's letter preceded his report in which he concluded that Atkins was competent at the time of the crimes. Atkins presents no evidence to suggest that his competency deteriorated in the approximately nine months between the crimes and trial. Further, Atkins presented a defense of "mere presence." Thus, his rejection of a guilty plea does not appear irrational. Finally, two days prior to trial defense counsel told the district court that Atkins had been disabused of his erroneous belief that two death sentences could not be imposed for the murder of one individual. Because the record belies Atkins' claim of incompetency, we conclude that his claims of ineffective assistance related to that claim lack merit. Similarly, Atkins' contentions that his appellate counsel should have argued that the district court erred in failing to grant Atkins a competency hearing, that Atkins was incompetent to be sentenced, and that he is or will be incompetent to be executed are not supported by the record and are without merit.

Order of Affirmance, Exh. 261, pp. 2–4 (ECF No. 94-43, pp. 3–5).

Atkins' claims of ineffective assistance of counsel in Claims 2 and 13, regarding his counsel's handling of the question of his competence to stand trial, are meritless, for the fundamental reason that there has never been any evidence presented to support the contention that Atkins was incompetent to stand trial. There is no showing that any such evidence was available to, or could have been developed by, Atkins' trial counsel. No such evidence was presented in Atkins' first state habeas action, and no such evidence is presented here. It always has been, and it remains, speculation that, had Atkins' trial counsel better prepared Dr. Colosimo, or earlier moved for a competency hearing, or done something else different with respect to the issue, they could have shown that Atkins was incompetent to stand trial. Absent any evidence indicating that Atkins was incompetent to stand trial, Atkins does not make any showing that his trial counsel performed unreasonably, or that he was prejudiced. And, absent such evidence, there is no showing that Atkins' appellate counsel was ineffective for failing to raise the issue on his direct appeal, or that he was prejudiced. The rulings on these claims by the Nevada Supreme Court were not contrary to, or an unreasonable application of, *Strickland* or any other Supreme Court precedent. The Court will deny Atkins habeas corpus relief on these claims.

The substantive claim in Claim 7(e)—that the trial court violated Atkins' federal constitutional rights by failing to grant a full and adequate competency hearing—is subject to dismissal under the procedural default doctrine. Atkins first asserted this claim in state court in his first state habeas action, and the Nevada Supreme Court ruled it procedurally barred under state law. *See* Appellant's Opening Brief, Exh. 256, pp. 15–19 (ECF No. 94-37, pp. 31–35); Order of Affirmance, Exh. 261, p. 1 n.2 (ECF No. 94-43, p. 2 n.2). Atkins does not show cause and prejudice relative to the procedural default; his appellate counsel was not ineffective for not asserting the claim on his direct appeal. Therefore, Claim 7(e) will be denied as procedurally defaulted.

Claim 3(a)

In Claim 3(a), Atkins claims that his federal constitutional rights were violated because his trial counsel were ineffective "for failing to investigate and present psychological evidence at the guilt phase of the trial." Fourth Amended Petition (ECF No. 183), pp. 140–43.

Atkins asserted this claim in his first state habeas action. *See* Appellant's Opening Brief, Exh. 256, pp. 13–15 (ECF No. 94-37, pp. 29–31). The Nevada Supreme Court ruled on the claim as follows:

> Atkins ... claims that his trial counsel failed to adequately investigate Atkins' mental status. Atkins also alleges that his trial attorneys erred by failing to introduce evidence of his mental infirmities at the guilt phase of his trial to defend against premeditation. Atkins is not entitled to relief on these claims. First, pursuant to defense counsel's request, Atkins met with clinical psychologist Dr. Philip Colosimo six times. Dr. Colosimo conducted psychological testing of Atkins on three of those occasions, and estimated that he spent a total of nine hours with him. Dr. Colosimo provided defense counsel with his written report and testified at Atkins' penalty hearing in mitigation of punishment. Atkins has not indicated what material evidence would have been discovered through additional investigation into his mental status or how that evidence would have affected the outcome of his trial. Second, Dr. Colosimo explicitly concluded in his report that Atkins was competent at the time he committed the crimes. We therefore conclude that the record repels Atkins' claims that his trial counsel's investigation or use of psychological evidence was objectively unreasonable and that he was prejudiced.

Order of Affirmance, Exh. 261, pp. 2–3 (ECF No. 94-43, pp. 3–4).

The Court finds the Nevada Supreme Court's ruling on this claim to be reasonable. Atkins points to the penalty-phase testimony of Dr. Colosimo (Transcript of Trial, April 27, 1995, Exh. 147, pp. 38–78 (ECF No. 92-8, pp. 42–82)), and argues that Atkins' trial counsel should have presented Dr. Colosimo as a witness in the guilt phase of the trial in an attempt to show that Atkins did not have the mental capacity to form the intent necessary for first-degree murder. However, while Dr. Colosimo testified that Atkins had various forms mental illness, there was nothing in his testimony supporting an argument that he lacked the mental capacity to form the intent necessary for first-degree murder. Furthermore, Atkins has never shown that further investigation, or better preparation of Dr. Colosimo, would have led to development of any such evidence.

1   This ruling by the Nevada Supreme Court was not contrary to, or an

2   unreasonable application of, *Strickland* or any other Supreme Court precedent. The

3   Court will deny Atkins habeas corpus relief on Claim 3(a).

4   <u>Claims 3(e) and 14, and the Related Part of Claim 13</u>

5   In Claim 3(e), Atkins claims that his federal constitutional rights were violated

6   because his trial counsel were ineffective "for failure to timely object to irrelevant and

7   prejudicial evidence from the victim's father." Fourth Amended Petition (ECF No. 183),

8   pp. 150–51. In Claim 14, Atkins claims that his federal constitutional rights were violated

9   because "the trial court erred in admitting irrelevant, cumulative and prejudicial victim

10  impact evidence at the guilt and penalty phases of the trial." *Id.* at 295–97. And, in the

11  related part of Claim 13, Atkins claims that his counsel on his direct appeal was

12  ineffective for not asserting, on the direct appeal, the claims in Claim 14. *Id.* at 293–94.

13  As the Court reads these claims, Claim 3(e) concerns the testimony of Gary Mason, the

14  victim's father, in the guilt phase of the trial (*see* Fourth Amended Petition (ECF No.

15  183), pp. 150–51; Transcript of Trial, March 23, 1995, Exh. 129, pp. 125–38 (ECF No.

16  91-34, pp. 36–49)), while Claims 14 and the related part of Claim 13 concern both the

17  guilt-phase testimony Gary Mason and the penalty-phase testimony of Gary Mason and

18  Maria Mason, the victim's mother (*see* Fourth Amended Petition (ECF No. 183), pp.

19  295–97; Transcript of Trial, April 26, 1995, Exh. 145, pp. 10–30 (ECF No. 92-6, pp. 14–

20  34)).

21  During the guilt phase of Atkins' trial, the prosecution gave notice that Gary

22  Mason would be called to testify, and the defense made a motion to exclude testimony

23  by him regarding the death of Ebony Mason's child about six months before her murder.

24  *See* Transcript of Trial, March 23, 1995, Exh. 129, pp. 3879–84 (ECF No. 91-33, pp.

25  89–94). The trial court denied the motion, ruling that the victim's state of mind and

26  possible explanations for her actions around the time of her murder were relevant, in

27  part because there was evidence of her drug use and sexual activity on the night of her

28  murder, and because, under cross-examination by defense counsel, prosecution

witness Shawn Atkins had referred to her as a "hood rat," apparently referring to her

alleged sexual proclivities. *See id*; *see also* Transcript of Trial, March 23, 1995, Exh.

129, p. 3843 (ECF No. 91-33, p. 53).

On his direct appeal, Atkins argued that the trial court erred in admitting the

testimony of Gary Mason regarding the death of Ebony Mason's child. *See* Appellant's

Opening Brief, Exh. 181, pp. 38–41 (ECF No. 93-3, pp. 20–23). The Nevada Supreme

Court ruled on that claim as follows:

> Atkins next asserts that the district court erred in admitting evidence relating to the previous death of Ebony Mason's child because it was irrelevant and more prejudicial than probative.

> Trial courts have considerable discretion in determining the relevance and admissibility of evidence. [*Sterling v. State*, 108 Nev. 391, 395, 834 P.2d 400, 403 (1992).] An appellate court should not disturb the trial court's ruling absent a clear abuse of that discretion. [*Lucas v. State*, 96 Nev. 428, 431–32, 610 P.2d 727, 730 (1980).] Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." NRS 48.015. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice or confusion of the issues or of misleading the jury. NRS 48.035(1).

> We conclude that the evidence of Ebony Mason's child's death was relevant because it was offered to respond to disparaging comments regarding Mason's character elicited by the defense. Shawn testified on cross-examination that he believed Mason was either intoxicated or high on drugs the night of the murder. Essentially, the defense put the victim on trial. In response, the State presented testimony from Gary Mason, Ebony Mason's father, that Ebony's child had died in a bathtub drowning six months prior to Mason's death. Gary Mason further stated that as a result of the death, Ebony suffered "from major depression and a post-traumatic stress syndrome." Gary Mason described Ebony Mason's depression and her use of illegal drugs as a result of that tragedy.

> We conclude that the evidence of Ebony Mason's child's death and her consequent depression are relevant to explain the defense's characterization of her as a "hood rat" and substance abuser. Whether this evidence was more probative than prejudicial should be left to the sound discretion of the trial court. *Petrocelli v. State*, 101 Nev. 46, 52, 692 P.2d 503, 508 (1985). We conclude that the district court's admission of this evidence was not an abuse of its discretion.

*Atkins*, 112 Nev. at 1133–34, 923 P.2d at 1126–27.

To the extent that the Nevada Supreme Court's ruling regarding Gary Mason's

guilt-phase testimony about the death of the victim's child was based on state law, it is

1    authoritative and beyond the scope of this federal habeas corpus action. *See Bradshaw*

2    *v. Richey*, 546 U.S. 74, 76 (2005) ("[S]tate court's interpretation of state law, including

3    one announced on direct appeal of the challenged conviction, binds a federal court

4    sitting in habeas corpus.") (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991));

5    *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).

6        Focusing on the Nevada Supreme Court's rejection of Atkin's claim under the

7    federal constitution—that the admission of Gary Mason's testimony about the death of

8    the victim's child, in the guilt phase of the trial, violated Atkins' federal constitutional

9    rights—where a state court has ruled on an issue without analysis, the federal habeas

10    court still affords the ruling deference under 28 U.S.C. § 2254(d). "Under § 2254(d), a

11    habeas court must determine what arguments or theories supported or ... could have

12    supported, the state court's decision; and then it must ask whether it is possible

13    fairminded jurists could disagree that those arguments or theories are inconsistent with

14    the holding in a prior decision of this Court." *Richter*, 562 U.S. at 102.

15        It is well established that "[h]abeas relief is available for wrongly admitted

16    evidence only when the questioned evidence renders the trial so fundamentally unfair

17    as to violate federal due process." *Jeffries v. Blodgett*, 5 F.3d 1180, 1192 (9th Cir. 1993)

18    (as amended). However, "[t]he Supreme Court has made very few rulings regarding the

19    admission of evidence as a violation of due process." *Holley v. Yarborough*, 568 F.3d

20    1091, 1101 (9th Cir. 2009). "Although the Court has been clear that a writ should be

21    issued when constitutional errors have rendered the trial fundamentally unfair, it has not

22    yet made a clear ruling that admission of irrelevant or overly prejudicial evidence

23    constitutes a due process violation sufficient to warrant issuance of the writ." *Id.* (internal

24    citation omitted); *see also Alberni v. McDaniel*, 458 F.3d 860, 863–67 (2006). Atkins

25    does not point to any clearly established federal law, as determined by the Supreme

26    Court, holding that admission of testimony such as that at issue here violates a

27    defendant's right to due process of law. This Court cannot find that the Nevada

28    Supreme Court's ruling was an unreasonable application of Supreme Court precedent,

1  such as to warrant habeas relief under 28 U.S.C. § 2254(d). The testimony of Gary

2  Mason about the death of the victim's child, in the guilt phase of Atkins' trial, was not so

3  unfairly prejudicial as to render Atkins' trial fundamentally unfair. The Court will deny

4  Atkins habeas corpus relief with respect to the part of Claim 14 that he raised in state

5  court on his direct appeal.

6      In his first state habeas action, Atkins asserted claims that the trial court erred in

7  admitting the testimony of Gary Mason and Maria Mason. *See* Petition for Post-

8  Conviction Relief, Exh. 211, p. 3 (ECF No. 93-34, p. 4); Supplemental Brief in Support

9  of Petition, Exh. 232, pp. 69–71 (ECF No. 94-13, pp. 70–72). The state district court

10 ruled those claims to be procedurally barred. *See* Findings of Fact, Conclusions of Law

11 and Order, Exh. 237 (ECF No. 94-18). On the appeal in the state habeas action, Atkins

12 asserted the narrower claim, already resolved on Atkins' direct appeal, that it was error

13 to allow the testimony of Gary Mason regarding the death of the victim's child, but he

14 conceded in his briefing that the claim was procedurally barred. *See* Appellant's

15 Opening Brief, Exh. 256, p. 69 (ECF No. 94-38, p. 22).

16     Atkins' claims regarding Gary Mason's testimony in the guilt phase beyond the

17 subject of the death of the victim's child—concerning the victim's drug addiction,

18 depression, post-traumatic stress disorder, and efforts at rehabilitation—are subject to

19 denial as procedurally defaulted, unless Atkins can show cause and prejudice relative to

20 the procedural defaults. There is no showing that this testimony was irrelevant, or

21 improper in any way; and that testimony did not render Atkins' trial fundamentally unfair.

22 The Court, then, finds insubstantial Atkins' claim that his trial counsel was ineffective for

23 not objecting to this testimony. The Court finds that Atkins' appellate counsel was not

24 ineffective for not asserting this substantive claim on his direct appeal. And, the Court

25 finds that Atkins' counsel in his first state habeas action was not ineffective for failing to

26 assert a claim of ineffective assistance of trial counsel relative to this testimony. This

27 part of Claims 3(e), 13 and 14—again, regarding Gary Mason's testimony in the guilt

28

1  phase beyond the subject of the death of the victim's child—will be denied as

2  procedurally defaulted.

3        Regarding the part of Claims 13 and 14 concerning the penalty-phase testimony

4  of Gary Mason and Maria Mason, it is well-established that victim impact testimony is

5  allowed in capital murder cases so long as it is not such as to render the trial

6  fundamentally unfair. In *Payne v. Tennessee*, 501 U.S. 808 (1991), the Supreme Court

7  held that, in the penalty phase of a capital trial, "if the State chooses to permit the

8  admission of victim impact evidence and prosecutorial argument on that subject, the

9  Eighth Amendment erects no *per se* bar." *Payne*, 501 U.S. at 827. The Court added: "In

10  the event that evidence is introduced that is so unduly prejudicial that it renders the trial

11  fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a

12  mechanism for relief." *Id.* at 825 (citing *Darden v. Wainwright*, 477 U.S. 168, 179–83

13  (1986)). The Court determines that any claim that the penalty-phase testimony of Gary

14  Mason or Maria Mason (*see* Transcript of Trial, April 26, 1995, Exh. 145, pp. 10–30

15  (ECF No. 92-6, pp. 14–34)) rendered Atkins' trial fundamentally unfair would have been

16  meritless. Atkins' appellate counsel was not ineffective for not asserting such a claim on

17  Atkins' direct appeal. The parts of Claims 13 and 14 concerning the penalty-phase

18  testimony of Gary Mason and Maria Mason will be denied as procedurally defaulted.

19        <u>Claims 3(f) and 3(g)</u>

20        Claims 3(f) and 3(g) are claims of ineffective assistance of counsel related to the

21  evidence of shoe prints found at the scene of the murder and on the victim's body. In

22  Claim 3(f), Atkins claims that his federal constitutional rights were violated because his

23  trial counsel were ineffective "for emphasizing on cross-examination that there were

24  three patterns of footwear." Fourth Amended Petition (ECF No. 183), p. 151. And, in

25  Claim 3(g), Atkins claims that his federal constitutional rights were violated because his

26  trial counsel were ineffective "for failure to present a shoe impression expert." *Id.* at

27  152–53.

28

Taking Claim 3(g) first, Atkins asserted this claim in his first state habeas action, and it was denied. The Nevada Supreme Court ruled on the claim as follows:

> ... Atkins claims that trial counsel were ineffective in failing to call an expert witness to rebut the State's contention that three different shoe prints were recovered from the area surrounding the victim and from the victim herself. This claim lacks merit. First, Atkins has failed to articulate how the rebuttal testimony of an expert witness would have affected the outcome of Atkins' trial. Second, in her cross-examination of the State's expert, defense counsel established (1) that the expert could not identify who was wearing the shoes leaving marks on and around the victim's body, and (2) that although three distinct footwear patterns were recovered from the crime scene, one shoe could have left multiple patterns. Further, defense counsel reiterated in her closing argument that three footwear patterns did not necessarily indicate the presence of three different shoes. Thus, the record repels Atkins' claim that his trial counsel's performance was objectively unreasonable or that he was prejudiced by their failure to call the suggested expert witness.

Order of Affirmance, Exh. 261, p. 7 (ECF No. 94-43, p. 8).

This Court determines that this claim is without merit, and that the Nevada Supreme Court's ruling was reasonable. Atkins does not in this action, and did not in state court, proffer any opinion of any expert to demonstrate what an expert might have said and how an expert opinion might have benefitted the defense. It is speculation that an expert witness would have opined in a manner that would have undermined the strong evidence that three different footwear patterns were found at the scene of the murder and on the victim's body. As the Court of Appeals stated in *Wildman v. Johnson*, 261 F.3d 832 (9th Cir. 2001):

> ... Wildman has not shown that his case was prejudiced as a result of not retaining an arson expert. Wildman offered no evidence that an arson expert would have testified on his behalf at trial. He merely speculates that such an expert could be found. Such speculation, however, is insufficient to establish prejudice. *See Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir.1997) (speculating as to what expert would say is not enough to establish prejudice).

*Wildman*, 261 F.3d at 839.

The Nevada Supreme Court's ruling, rejecting the claim made here by Atkins in Claim 3(g) was not contrary to, or an unreasonable application of, *Strickland*, or any other Supreme Court precedent. The Court will deny Atkins relief on Claim 3(g).

In Claim 3(f), Atkins contends that his trial counsel was ineffective in cross-examining prosecution witness David Lemaster, a crime scene analyst, because, as Atkins' sees it, his counsel questioned Lemaster in a way that affirmed that three separate footwear patterns were found that the scene of the crime, and thereby "needlessly emphasized the culpability of her client." Fourth Amended Petition (ECF No. 183), p. 151.

In his first state habeas action, Atkins made no claim like the one in Claim 3(f). *See* Petition for Post-Conviction Relief, Exh. 211 (ECF No. 93-34); Supplemental Brief in Support of Petition, Exh. 232 (ECF No. 94-13); Appellant's Opening Brief, Exh. 256 (ECF Nos. 94-37, 94-38). Therefore, this claim is subject to denial as procedurally defaulted, unless Atkins can show cause and prejudice under *Martinez*.

Lemaster was present at the autopsy of the victim, and he photographed several bruises on her body. *See* Transcript of Trial, March 23, 1995, Exh. 129, pp. 3947–49 (ECF No. 91-34, pp. 63–65). On direct examination, Lemaster testified that he saw "three distinct separate types of patterns" left by footwear on the victim's body, and he described the three distinct patterns that he saw. *See id.* at 3951–52 (ECF No. 91-34, pp. 68–69). Atkins' trial counsel cross-examined Lemaster on this subject as follows:

> Q.    And you testified regarding different patterns of, I believe you called them contusion areas. Is that what you called them?
>
> A.    They were described as bruises or contusions.
>
> Q.    Okay.
>
> A.    The two are synonymous.
>
> Q.    And you indicated that there were three different patterns of contusion areas?
>
> A.     In my opinion.
>
> Q.    Okay.
>
> A.    What I saw.
>
> Q.    And you also testified that you're aware of what footprints look like from burglary cases or something that you've worked on?

A.      Absolutely. Many times at burglary scenes footwear evidence is present and ...

Q.      Okay.

A.      ... many times have I documented it.

Q.      Are you a footprint expert?

A.      No, I'm not.

Q.      Okay. And in looking at those three different patterns that you talked about, you're not indicating those are three separate footprints, are you?

A.      I don't understand your question.

Q.      Each pattern does not represent a different footprint, does it?

A.      Each pattern ...

Q.      you describe in those pictures three different patterns.

A.      Yes.

Q.       I think one was a – I think Mr. – I think you were asked whether they were small herringbone, large herringbone, and a diamond shape. Is that correct?

A.      Counsel described it as that and I agreed. I could also add my own descriptors to that.

Q.      Okay. And you're not saying that a separate shoe made each one of those prints, the patterns, correct?

A.      What I'm saying is, by looking at it, the three patterns seemed separate and distinct to me.

Q.      Right. But my question to you is they're different patterns, they're not different footprints according to your testimony, correct?

A.      I'm going to say to me, by looking at them once again, they appear to be three distinct different pattern types.

Q.      You're not a footprint expert, right?

A.      No, ma'am, I have not attended FBI footprint.

Q.      Okay. And your testimony is that they're merely three different patterns?

A.      Yes, ma'am.

*Id.* at 3965–67 (ECF No. 91-34, pp. 81–83).

Taking into consideration Lemaster's direct testimony, the cross-examination of him, and the entire record of the trial, the Court concludes that this claim of ineffective assistance of trial counsel is without merit. When Atkins' trial counsel cross-examined Lemaster, Lemaster had already made clear in his direct testimony that he observed three different and distinct footwear patterns on the victim's body. On cross-examination, Atkins' counsel did not add to that or emphasize it unduly; what she did in her cross-examination was point out that Lemaster could not be certain that those three patterns necessarily were made by three different shoes. She also brought out the fact that Lemaster was not a footwear expert. Atkins' trial counsel's cross-examination of Lemaster was not objectively unreasonable. Moreover, it is plain that Atkins was not prejudiced; several other witnesses testified that there were three different and distinct footwear patterns on the victim's body. *See* Transcript of Trial, March 23, 1995, Exh. 129, pp. 3898–3900, 3911–13 (ECF No. 91-34, pp. 14–16, 27–29) (testimony of Dr. Robert Jordan, forensic pathologist who performed autopsy); Transcript of Trial, March 27, 1995, Exh. 133, pp. 4286–87 (ECF No. 91-40, pp. 25–26) (testimony of Karen Good, crime scene analyst present at the autopsy); Transcript of Trial, March 27, 1995, Exh. 133, pp. 4292–93 (ECF No. 91-40, pp. 31–32) (testimony of Norman R. Ziola, police officer present at the autopsy); Transcript of Trial, March 28, 1995, Exh. 135, pp. 52–53 (ECF No. 91-42, pp. 57–58) (testimony of Richard George Good, Sr., police firearms and tool mark examiner who examined footwear patterns on victim's body).

Therefore, the Court finds that Atkins' claim of ineffective assistance of trial counsel in Claim 3(f) is meritless and is not substantial within the meaning of *Martinez*. Atkins' counsel in his first state habeas action was not ineffective for not asserting this claim. Atkins does not show cause and prejudice relative to the procedural default of Claim 3(f). Claim 3(f) will be denied as procedurally defaulted.

Claim 3(i)

In Claim 3(i), Atkins claims that his federal constitutional rights were violated because his trial counsel were ineffective for "failure to impeach three key prosecution

33

witnesses." Fourth Amended Petition (ECF No. 183), pp. 154–60. The claim focuses on Atkins' trial counsel's cross-examination of prosecution witnesses Mark Wattley, Jerry Anderson and Michael Smith. *See id.*

Atkins did not assert such a claim in his first state habeas action. *See* Petition for Post-Conviction Relief, Exh. 211 (ECF No. 93-34); Supplemental Brief in Support of Petition, Exh. 232 (ECF No. 94-13); Appellant's Opening Brief, Exh. 256 (ECF Nos. 94-37, 94-38). Therefore, Claim 3(i) is subject to denial as procedurally defaulted, unless Atkins can show cause and prejudice relative to the procedural default under *Martinez*.

Atkins compares the testimony of Wattley, Jerry Anderson and Smith in Doyle's trial (Pet. Exh. 66 (ECF No. 183-29) (testimony of Wattley in Doyle's trial); Pet. Exh. 67 (ECF No. 183-30) (testimony of Jerry Anderson in Doyle's trial); Pet. Exh. 68 (ECF No. 183-31) (testimony of Smith in Doyle's trial)) to their testimony in Atkins' trial (Transcript of Trial, March 27, 1995, Exh. 133, pp. 28–45 (ECF No. 91-39, pp. 33–50) (testimony of Wattley in Atkins' trial); Transcript of Trial, March 27, 1995, Exh. 133, pp. 49–91 (ECF No. 91-39, p. 54 – ECF No. 91-40, p. 2) (testimony of Jerry Anderson in Atkins' trial); (testimony of Smith in Atkins' trial)), identifies perceived differences between the testimony in the two trials, and contends that his trial counsel were ineffective for not exploiting those differences in cross-examining the witnesses. *See* Fourth Amended Petition (ECF No. 183), pp. 154–60.

The Court determines that this claim is insubstantial. Wattley, Jerry Anderson and Smith were not present when the murder occurred; they were not eyewitnesses. Generally, rather, each observed events and heard conversations, involving Atkins, Doyle and Shawn, after the murder. Many of the alleged differences in their testimony in the two trials were not differences at all; rather, they were occasions where the witness provided more detail in one trial than in the other. Many of those are occasions where the prosecutors naturally elicited different details in the two trials because there were different defendants on trial. Some of the alleged differences were merely differences in the wording used by the witness in answering questions in the two trials. All of the

alleged differences were, in this Court's view, inconsequential. Atkins' counsel in his first state habeas action was not ineffective for not asserting this claim of ineffective assistance of counsel.

Atkins does not show cause and prejudice, under *Martinez*, relative to the procedural default of this claim. Claim 3(i) will be denied as procedurally defaulted.

Claim 3(j)

In Claim 3(j), Atkins claims that his federal constitutional rights were violated as a result of ineffective assistance of his trial counsel because of "cumulative ineffective assistance of counsel at the guilt phase." Fourth Amended Petition (ECF No. 183), pp. 154–60. Atkins does not show any deficiencies of his counsel's performance in the guilt phase of his trial. Therefore, there are no deficiencies of counsel to be considered cumulatively. The Court will deny Atkins habeas corpus relief on Claim 3(j).

Claim 4(a)

In Claim 4(a), Atkins claims that his federal constitutional rights were violated as a result of ineffective assistance of his trial counsel because his "trial counsel unreasonably failed to retain and supervise appropriate investigators and other staff to conduct an adequate and timely investigation." Fourth Amended Petition (ECF No. 183), p. 172.

Claim 4(a) is similar to Claim 1(a) in that Claim 4(a) provides explanation and support for other claims of ineffective assistance of counsel in Atkins' petition, particularly Claim 4(b). Claim 4(a) does not set forth any specific facts showing how the alleged inadequate investigation prejudiced Atkins. To the extent that in Claim 4(a) Atkins seeks relief for the same alleged ineffective assistance of trial counsel alleged in other, more specific and more detailed claims (again, particularly Claim 4(b)), Claim 4(a) is repetitive and redundant, and unnecessary as a separate claim.

The Court will deny Atkins habeas corpus relief on Claim 4(a) but will consider the allegations made by Atkins in Claim 4(a) in reviewing Atkins' other claims of ineffective assistance of trial counsel.

Claim 4(b)

In Claim 4(b), Atkins claims that his federal constitutional rights were violated as a result of ineffective assistance of his trial counsel because his "trial counsel failed to investigate and present readily available and substantially mitigating social history evidence." Fourth Amended Petition (ECF No. 183), pp. 172–81.

In the penalty phase of his trial, Atkins called his father, Sterling Atkins, Sr., as a witness. *See* Transcript of Trial, April 27, 1995, Exh. 147 (ECF No. 92-8). Sterling Atkins, Sr., testified that he and Atkins' mother, Lorraine, had arguments every day, and some physical fights. *Id.* at 4 (ECF No. 92-8, p. 8). He testified that Atkins witnessed his fights with Lorraine. *Id.* He testified that he was an alcoholic, that both he and his wife drank every day, and that it was an "everyday occurrence" to be drunk in front of Atkins and his siblings. *Id.* at 4–5 (ECF No. 92-8, pp. 8–9). He testified, as follows, that he physically abused Atkins:

> Q.   Did you ever physically abuse Sterling?
>
> A.   Yes, ma'am.
>
> Q.   And can you explain that to the jury?
>
> A.   Well, with drinking and arguments with the mother, it was constantly – you know, kids get into things, and like I say ... Kids get into things, and it was constantly always argument in the home, and Bubba was – Sterling [would] kind of act up. And the worst came out on him.
>
> Q.   ... Was there any physical punishments imposed in your home?
>
> A.   Yes.
>
> Q.   What type of physical punishments?
>
> A.   I did the whooping, and it would be – you know, I would hit him with my hand, anything that was around.

*Id.* at 6 (ECF No. 92-8, p. 10.) He testified that Atkins and his siblings were removed from his home by the State of California, and placed first with a relative and then in a foster home, and he testified, as follows, why that happened:

Q. Okay. Can you tell the jury why they removed the children from your home?

A. Sterling and Shawn had started a fire, and I had took their finger and rubbed it over the burner on the stove. And my wife called the police, and they came and they took the kids.

Q. Were you ever charged with anything?

A. I was charged with child abuse.

*Id.* at 6–7 (ECF No. 92-8, pp. 10–11). He testified that he was not a role model for Atkins, and that Atkins did not grow up in a healthy environment. *Id.* at 7–8 (ECF No. 92-8, pp. 11–12).

Atkins also called his half-sister, Stephanie Normand, as a witness. *See* Transcript of Trial, April 27, 1995, Exh. 147 (ECF No. 92-8). She testified that she lived in the home with Atkins when he was growing up, and that they moved around a lot, and lived in several different places. *Id.* at 12–13 (ECF No. 92-8, pp. 16–17). She testified as follows:

Q. Can you explain to the jury and to the Court what it was like growing up in your household?

A. Well, both of my parents are alcoholics, so there was a lot of fighting and arguing and beatings.

Q. Was there arguing between your parents?

A. Between my parents.

Q. Was there arguing with the children as well?

A. Yes.

Q. What type of beatings were there?

A. My dad put – like, Shawn and Sterling got caught playing with fire, and he put their hands on the stove and burnt their hands up really bad. And we got taken away. They gave – took us to foster homes.

Q. Did you all go to foster homes together?

A. Yes, and then they split us up.

Q. Okay. How long were you in foster homes?

A. About a year, two years.

1

Q.      Is that the only physical punishment that you remember growing up?

2

A.      No.

3

Q.      What other kinds of physical punishment was there?

4

5

A.      He would beat Sterling more than us, me and Shawn. Sterling seemed to get into more trouble or something – with a 2x4, just with everything, belts, 2x4's, anything he could pick up he would use.

6

Q.      And how often did that occur?

7

A.      All the time.

8

9

Q.      Growing up in your household, would you think – would you say it was the same as the friends that you were hanging around with at that time?

10

A.      No.

11

Q.      How was it different?

12

13

A.      There was always a lot of arguing and fighting. I would run away. I ran away about three different occasions, because I didn't want to be around my family.

14

15

Q.      Did you ever observe Sterling getting physically punished by your father?

16

A.      Yes.

17

Q.      Did you ever try to do anything?

18

19

A.      I was cutting a pie one time, and I don't know what he did, but my dad was hitting him, just beating on him. And I was so mad that I wanted to stick him with the knife that I was cutting the pie with.

20

Q.      And did you?

21

A.      No, I didn't stick him with it.

22

Q.      Did you do anything?

23

A.      I threw the pie down and I told him to stop hitting him. And he turned around, and he punched me in the mouth.

24

25

Q.      Are there any other – are there any other kind of punishments that were imposed in your household?

26

27

A.      He would make them stand in corners overnight putting their hands on the wall, and just let them stay there. They couldn't move or nothing.

28

Q.      And you said – you testified earlier that it was Sterling that got the brunt of most of the punishment?

1       A.     Always.

2       Q.     More so than Shawn?

3       A.     Yes.

4       Q.     More so than yourself?

5       A.     Yes.

6  *Id.* at 13–15 (ECF No. 92-8, pp. 17–19). She testified that, because her mother was an

7  alcoholic, she took on most of the responsibility for raising Atkins and Shawn, although

8  she was only three years older than Atkins. *Id.* at 15–16 (ECF No. 92-8, pp. 19–20).

9  Regarding her parents' alcoholism, she testified as follows:

10      Q.     You stated your parents were alcoholics. Did you ever see
   them drunk?

11

12      A.     All the time. I would have to carry my mom – like, she would
   have to go to the bathroom, I would have to take her to the bathroom
   because she would be so drunk she would fall. I would pick her up and put

13   her in the bed, feed her before she went to sleep so she wouldn't get sick.

14      Q.     Now you...

15      A.     I would drive my dad home when he would get really drunk
   and he'd be down the street or something; I would have to throw him in

16   the back of the truck and drive him home.

17 *Id.* at 16 (ECF No. 92-8, p. 20).  She testified that Atkins' parents were not good role

18 models. *Id.* at 18 (ECF No. 92-8, p. 22).

19      Atkins also called Jack Hardin as a witness in the penalty phase of his trial. *See*

20 Transcript of Trial, April 27, 1995, Exh. 147 (ECF No. 92-8). Hardin was retired from

21 employment as Associate Warden of Operations at the Northern Nevada Correctional

22 Center. *See id.* at 22 (ECF No. 92-8, p. 26). Hardin testified about the process a

23 prisoner convicted of first-degree murder would go through when received into the

24 prison system, about where such a prisoner would be incarcerated, and about what the

25 conditions would be like. *Id.* at 23–37 (ECF No. 92-8, pp. 27–41).

26      Atkins then called Dr. Philip Colosimo, a psychologist. *See* Transcript of Trial,

27 April 27, 1995, Exh. 147 (ECF No. 92-8). Dr. Colosimo interviewed of Atkins,

28 administered a battery of psychological tests to him, and prepared a report. *See id.* at

40 (ECF No. 92-8, p. 44). Dr. Colosimo spent approximately nine hours with Atkins over the course of six meetings. *See id.* at 40–41 (ECF No. 92-8, pp. 44–45). Dr. Colosimo testified that he determined that Atkins had "a schizo-effective disorder which means that he has signs and symptoms [of] schizophrenia, disorganized thinking, bizarre mentation, and affective problems – that is, he has depression sometimes with some kind of manic activity, but mostly depressive by nature, with paranoid thoughts." *See id.* at 44 (ECF No. 92-8, p. 48). He testified that "[p]aranoid traits include a tremendous suspiciousness of others and their intentions, and it's sort of a real delusional viewpoint of the world, that the world is out to get him or to hurt him." *Id.* He testified that he:

> Also determined [Atkins] had psychoactive substance dependence and that included, as he has reported, he has experimented with just a lot of drugs. He talked about LSD, cannabis, cocaine, and also alcohol. And I imagine there are others as well.

*Id.* at 44–45 (ECF No. 92-8, pp. 48–49). He testified further:

> I determined that this individual has antisocial personality characteristics. It's been referred to as sociopathy or psychopathic behaviors. Has schizoid withdrawn style in that he doesn't trust others and alienates [himself] from others and alienates himself from his family much of the time. Also he has narcissistic personality characteristics.

*Id.* at 45 (ECF No. 92-8, p. 49). Dr. Colosimo testified that Atkins had "a head injury he obtained at an adolescent age where he was beaten very heavily in a fight ... he was apparently knocked out and also beaten in the head – in the back of the head and the front of the head and incurred [an] unconscious period. He could not remember how long he was unconscious." *Id.* at 45–46 (ECF No. 92-8, pp. 49–50). Dr. Colosimo testified that Atkins had "psycho-social stressers, and that was determined to be social, socialization problems, emotional problems, financial, general adjustment difficulties." *Id.* at 46 (ECF No. 92-8, p. 50). Dr. Colosimo testified that Atkins' "highest adaptation or current adaptation level" indicated that he "functions daily in sort of a symptomatic way and also has psychiatric problems that exist throughout the day." *Id.* Dr. Colosimo testified:

> And as I reported before, the paranoid thinking, the delusional thinking, the bizarre mentations, also has reports hearing voices. And he said that the voices were quiet when he was inside the prison. And I had asked him if any of these voices told him to do some of the things he did. He was not clear in his answer.
>
> He did note that the voices were much louder when he was out of prison. After being placed in prison in a controlled shelter environment, these voices have not been as pronounced and are faint instead of pronounced.

*Id.* Dr. Colosimo testified that Atkins read at the third-grade level, his spelling was at the second-grade level, and his arithmetic was at the second-grade level. *Id.* at 47 (ECF No. 92-8, p. 51). He testified that this indicated "a pronounced functional lag in academic achievement, and this is usually found in people that have impoverished environments growing up." *Id.* He testified that Atkins was "functioning with a full scale IQ of 87," which is "dull normal intelligence or well below average." *Id.* at 47–48 (ECF No. 92-8, pp. 51–52). He testified that Atkins had "some left-to-right hemispheric dysfunctioning ... that he has a dysfunctioning in the left hemisphere." *Id* at 48 (ECF No. 92-8, p. 52). He testified that Atkins "had a verbal IQ of 84 which is in the low average range, and also it would indicate that he has experienced pronounced learning disabilities since he began school." *Id.* Dr. Colosimo testified further:

> Q.    Okay. With respect to your conclusion of this case,
>
> "His impaired thinking could cause poor decision and judgment-making. His chronic feelings and anxiety cause him to hear voices and think the worst of every situation."

Could you explain that a little bit?

> A.    Yeah. Mr. Atkins has attention deficit disorder that I failed to mention in Axis 1. Attention deficit disorder ... causes individuals going through elementary and adolescence and their adulthood to have learning impairments. In his case, the information was never really processed well within his overall cerebral functioning. That is, he may have an impulsive thought and he would follow through and do it without really looking at the consequences.
>
> And it gets even deeper than that. Even his basic living needs and his home hygiene and various things that he should be taking care of himself, he was unable to do that well because of the inability to process this information and made sense out of it in his environment or in reality, which I'm sure had led to his concentration and attention problems in school and made him a very ... learner with a poor prognosis, made him

41

unbearable many times in elementary and in high school which he never completed. He went to the eighth or ninth grad and then dropped out.

Basically because of his inability to attend, his impulsive thinking and behaviors, I believe that he probably also had a thought disorder back then which may have been precipitated by the heavy blow to the head in gang fights

Q.      Now, these psychological problems, if you will, that Sterling Atkins is experiencing, could you tell me whether those are genetically based or if those were a product of his environment?

A.      The attention deficit disorder and also schizophrenia for that matter has been known to be largely based in genetics. If one parent, for example, has it, you have a 50 percent chance of getting it. And if both parents have it, then you're most surely going to get it.

I think the argument for genetic or heredity versus environmental is at issue here. Environmentally he was brought up by his father mostly, and his mother, who stayed together until '91 and then divorced. But from what Mr. Atkins reports, he was abused physically by his father whom he called an alcoholic since his very early childhood years. This most certainly had a great impact on his ability to think and reason, process information, and to be able to learn.

*Id.* at 48–50 (ECF No. 92-8, pp. 52–54). In addition, Dr. Colosimo testified:

I would imagine that Mr. Atkins would have been a good case of diagnosed attachment disorder which is a childhood diagnosis when young. These all lead to a high recidivism rate for delinquency in childhood and adolescence, and also into adulthood.

*      *      *

Q.      ... [D]o you believe Sterling Atkins perceives situations the same as you or I might perceive them?

A.      No, I don't.

Q.      Could you tell me a little bit about the differences?

A.      Sterling has been in and out of foster homes and prisons most of his life. He really gets very anxious, and of course, his impulsivity and his inability to attend to the laws of the society [that] he's operating in prevail.

When he is in prison or when he was in juvenile homes, Sterling seemed to enjoy those quite a bit, because he knew what his boundaries were. He knew how far he could go. And although at times he stated that he had some rough times being in these places, it seemed that – his history indicates that not long out of these places he was back in again and his probation periods were relatively short because of him being returned back to those places because of delinquent behaviors.

I think he sees the world as a very scary, anxious world. I think he sees it from a paranoid perspective. And he is very suspicious of others'

intentions, and that accounts much for his anger and violence and in the way he impulsively does things in a violent way. He never really had the opportunity to have that structure built into his psyche. He's been primarily managed by outward control of his behaviors. And these in turn would – he would not show any type of criminal behavior on his part while in prison or being in juvenile homes.

He said the foster homes worked out for a little while, but he really wanted to get back to his parents. His parents would take him back for short periods of time and then be out of his life again, although not really providing the steadiness that ne needed.

Q.      So you think he would adapt well to the control of the environments that is a prison?

A.      Most certainly.

*Id.* at 51–53 (ECF No. 92-8, pp. 55–57).

Atkins' claim in Claim 4(b) is that his trial counsel were ineffective for not developing and presenting more mitigation evidence.

Atkins argues that he exhausted this claim in state court in his first state habeas action, and the Court agrees. *See* Reply (ECF No. 222), p. 113; *see also* Supplemental Brief in Support of Petition, Exh. 232, pp. 37–39 (ECF No. 94-13, pp. 38–40). In the claim in his first state habeas action, Atkins asserted:

As evidence in mitigation of punishment, counsel called Sterling Atkins Sr., Petitioner's father[,] and Stephanie Normand, Petitioner's sister. Sterling Atkins Sr. testified that he was an alcoholic and often would physically abuse the Petitioner and his siblings. Sterling Atkins Sr. testified that on one occasion he took the Petitioner's and Shawn Atlkins' fingers and rubbed them over the burner on the stove. Sterling Atkins Sr. testified that as a result of this incident the police took the Petitioner and Shawn. He testified that they went to live with their uncle in [Cerritos], and then they went to a foster home.

Stephanie Normand, Petitioner's [half-sister], also testified during the penalty phase. Stephanie testified that the family lived in many different places. She testified to the arguing and the beatings. She testified to the burning of the Petitioner and Shawn and the fact that all of the children were taken away from the parents and placed into [a] foster home. Stephanie testified that the Petitioner, Shawn and herself were ultimately split apart. She testified that the Petitioner was beaten the most. She stated that her father used a 2x4, belts or anything he could pick up.

If petitioner's counsel had conducted anything other than the most cursory examination into petitioner's background, counsel would have been able to present compelling evidence, readily available at the time of Mr. Atkins' state court proceedings, to corroborate the physical abuse that the Petitioner sustained at the hand of his father over the course of many years. Had trial counsel conducted an adequate mitigation investigation,

they would have discovered available evidence that petitioner was systematically subjected to severe physical and emotional abuse by his father throughout his childhood and adolescence, and that Sterling Atkins terrorized petitioner and his brother and sister with brutal acts of physical and emotional abuse.

### a.     Loraine Atkins

Petitioner's Mother, Loraine Atkins, could have described Sterling Atkins' treatment of his sons in great detail, relaying stories of severe beatings that rarely if ever resulted in medical treatment, and describing a life of extreme poverty and physical and emotional neglect.

### b.     Shawn Atkins

Shawn Atkins could have corroborated their childhood. Trial counsel did not speak to Shawn Atkins at any time in preparation for petitioner's trial and sentencing hearing. It is believed that Shawn Atkins would have testified during the penalty phase as to the physical and mental childhood abuse that was inflicted upon them by their father.

### c.     Foster Parents

Other witnesses with compelling information on petitioner's background, but who were not contacted by petitioner's trial counsel, were the foster parents of Sterling Atkins.

### d.     Sterling's Uncle

Sterling Atkins['] uncle, who cared for the petitioner and his brother and sister[,] could also have corroborated the physical and mental childhood abuse that was inflicted upon the petitioner by his father. He was not contacted by defense counsel.

### e.     Further time requested to develop mitigating evidence

It is believed that there are other witnesses that would have been available to testify to the abuse and neglect sustained by the petitioner during the course of his childhood. It is further believed that there is additional evidence of the petitioner's mental deficiencies that surfaced when he was a very young boy. It is requested that an evidentiary hearing be granted to examine these issues more thoroughly. It is also requested that petitioner have additional time as well as the resources of an investigator to more fully develop these issues.

*Id.* (citations to trial transcript omitted). The state district court denied the claim. *See*

Findings of Fact, Conclusions of Law and Order, Exh. 237, pp. 21–22 (ECF No. 94-18, pp. 22–23). On the appeal, the Nevada Supreme Court affirmed, ruling as follows:

... Atkins contends that his trial counsel failed to discover and present corroborating evidence of the physical and emotional abuse that Atkins suffered throughout his childhood. The record belies this claim. To develop such evidence, defense counsel called Atkins' father and sister to testify at Atkins' penalty hearing. Both of these witnesses testified to the

1
2
3
4

> repeated physical and emotional abuse Atkins received from his formerly alcoholic father and otherwise established that Atkins grew up in a very dysfunctional environment and was at one point removed from his parents' home and placed in foster care. Further, Atkins has failed to explain how additional testimony would have altered the outcome of his trial. We therefore conclude that Atkins has failed to articulate how his counsel's performance was objectively unreasonable or how he was prejudiced.

5   Order of Affirmance, Exh. 261, p. 5 (ECF No. 94-43, p. 6).

6       In federal court, in Claim 4(b), Atkins presents the same claim, but instead of

7   pointing to Lorraine Atkins, Shawn Atkins, Atkins' foster parents, his uncle, and

8   unnamed "other witnesses," as witnesses who could have provided corroborating

9   testimony, he points to Shawn, Evelyn Gomez, Alicia Palencia, and Vaedra Sowerby-

10  Jones, and he supports the claim with declarations of those individuals. *See* Fourth

11  Amended Petition (ECF No. 183), pp. 172–81; *see also* Declaration of Shawn Atkins,

12  Pet. Exh. 27 (ECF No. 183-16, pp. 1–9); Declaration of Evelyn Gomez, Pet. Exh. 29

13  (ECF No. 183-16, pp. 16–21); Declaration of Alicia Palencia, Pet. Exh. 30 (ECF No.

14  183-16, pp. 22–27); Declaration of Vaedra Sowerby-Jones, Pet. Exh. 32 (ECF No. 183-

15  16, pp. 31–37).

16      Atkins contends that Shawn could have testified regarding: the abuse of Atkins

17  by his father; Atkins' mother's life; Atkins' grandmother's life; Atkins' great-grandfather's

18  violent nature; an incident involving Atkins' uncle, Junior, entering Atkins' family's home

19  with a gun; an incident involving Atkins' father shoving Stephanie into a wall; an incident

20  involving Atkins' father beating Shawn because he had trouble putting on underwear;

21  the incident involving Atkins' father burning Atkins' and Shawn's hands on a stove; an

22  incident involving Atkins' father "jamming a cigar down [his] throat and throwing him out

23  a window;" violence between Atkins' father and mother; violence directed at Stephanie

24  by Atkins' mother; gambling, alcohol and drug addiction on the part of various family

25  members; times when Atkins' family lived in shelters or was homeless; Atkins' and his

26  siblings' placement in foster homes; an incident in which Atkins' father stabbed Atkins'

27  Uncle Philip; Stephanie's drug addiction; Atkins' drug addiction; Atkins' poor

28  performance in school; and Atkins' low mental functioning. *See id.* at 172–77. Atkins

contends that Evelyn Gomez, his great aunt, could have testified regarding Atkins' maternal grandparents' lives; Atkins' mother's life; Atkins' father's life; times when Atkins' family was homeless; and Atkins' parents' alcoholism. *See id.* at 177–78. Atkins contends that Alicia Palencia, Atkins' maternal aunt, could have testified regarding Atkins' mother's life; Atkins' parents' drug use and alcoholism; Atkins' father's abuse of Atkins' mother; an incident involving Atkins' mother shooting Atkins' father; an incident involving Atkins' mother stabbing Atkins' father; times when the Atkins family was homeless; the incident involving Atkins' father burning Atkins' and Shawn's hands on a stove; Stephanie's drug addiction; and Atkins' mother's stroke, placement in a care facility, and death. *See id.* at 177–78. As for Vaedra Sowerby-Jones, who was Doyle's girlfriend when the murder took place, Atkins claims she could have provided potentially mitigating testimony regarding Atkins' apparent low mental functioning and emotional instability. *See id.* at 180–81.

In considering a claim under 28 U.S.C. § 2254(d)(1), a federal habeas court is not to consider evidence that was not presented in state court; federal habeas review of state court decisions under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181. The Supreme Court explained:

> Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time *i.e.*, the record before the state court.

*Id.* at 181–82. In other words, if a claim was adjudicated on the merits by a state court, "evidence later introduced in federal court is irrelevant to § 2254(d)(1) review." *Id.* at 184; *see also Crittenden v. Chappell*, 804 F.3d 998, 1010 (9th Cir. 2015) ("*Pinholster* precludes the consideration of new evidence [ ] for the purpose of determining whether the last reasoned state court decision was contrary to or an unreasonable application of clearly established law"); *Floyd v. Filson*, 949 F.3d 1128, 1147–48 (2020) (federal

district court properly declined to consider news articles presented in federal court but not in state court in support of claim that petitioner's constitutional rights were violated by trial court's failure to grant change of venue).

Comparing Claim 4(b) to the similar claim Atkins asserted in his first state habeas action, the Court determines that Claim 4(b) is exhausted and not procedurally defaulted. The new factual allegations in Claim 4(b) and the new evidence presented in support of the claim—that is, the allegations and evidence presented in federal court but not in state court—do not "fundamentally alter" the claim. *See Vasquez v. Hillery*, 474 U.S. 254, 260 (1986). A claim is "new" and unexhausted if "new factual allegations either fundamentally alter the legal claim already considered by the state courts or place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it." *Dickens v. Ryan*, 740 F.3d 1302, 1318 (9th Cir. 2014) (en banc). In federal court, Atkins presents allegations about mitigating testimony that could have been given by Evelyn Gomez, Alicia Palencia and Vaedra Sowerby-Jones; those allegations were not made in state court. In addition, Atkins presents evidence that was not presented in state court: the declarations of Shawn, Gomez, Palencia, and Sowerby-Jones. The Court determines that the new allegations and evidence do not place the claim in a significantly different and stronger evidentiary posture than in state court.

Turning, then, to the determination to be made under 28 U.S.C. § 2254(d)(1), the Court determines that the Nevada Supreme Court's ruling was reasonable. The Nevada Supreme Court reasonably found the evidence proffered by Atkins to be largely cumulative of the evidence presented by Atkins at trial. And, the Nevada Supreme Court reasonably determined that the additional evidence would not have raised a reasonable probability of a different outcome in the sentencing phase of the trial. Contrary to Atkins' argument, the testimony of his father and his half-sister in the penalty phase of his trial was forceful; it graphically conveyed the abuse, neglect and dysfunction that Atkins endured during his upbringing. Additionally, Dr. Colosimo's testimony provided expert

corroboration for the testimony of Atkins' father and half-sister. Affording the Nevada Supreme Court's ruling the deference mandated by section 2254(d)(1), the Court concludes that it is arguable by fairminded jurists that the Nevada Supreme Court's ruling on this claim was correct. *See Richter*, 562 U.S. at 101. The Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, *Strickland*, or any other Supreme Court precedent. The Court will deny Atkins relief on Claim 4(b).

In the alternative, treating the new allegations and evidence as fundamentally altering the claim, rendering Claim 4(b) a new claim that is technically exhausted but subject to procedural default analysis, the Court determines that Atkins does not overcome the procedural default under *Martinez*. The declarations of Shawn, Gomez, Palencia, and Sowerby-Jones provide some new evidence, regarding drug and alcohol use, violence and dysfunction on the part of Atkins' parents, grandparents and even great-grandparents, but, for the most part, that new information is not particularly mitigating as, for the most part, it does not involve Atkins directly. The declarations mention, briefly, some events not revealed to the jury in the penalty phase of the trial, or in the first state habeas action, that might have directly involved Atkins or that he might have witnessed, for example the incident involving Junior entering the family home with a gun, the incident involving Atkins' father shoving Stephanie into a wall, the incident involving Atkins' father beating Shawn because he had trouble putting on his underwear, the incident involving Atkins' father "jamming a cigar down [his] throat and throwing him out a window," and the incident involving Atkins' father stabbing Atkins' Uncle Philip. However, regarding many of those events, the declarations do not indicate whether Atkins was involved or witnessed them, or how he was personally affected. Moreover, this new information does not significantly alter the portrayal of the nightmarish abuse, neglect and dysfunction in Atkins' family that was presented to the jury through the testimony of Atkins' father, his half-sister, and Dr. Colosimo. The Court determines that Atkins was not prejudiced by the failure of his counsel in his first state habeas action to support his claim with declarations such as those of Shawn, Gomez,

Palencia and Sowerby-Jones, and Atkins was not prejudiced by his trial counsel not presenting such testimony at trial. There is no showing that the new evidence would have raised a reasonable probability of a different outcome in Atkins' first state habeas action or the penalty phase of his trial. Therefore, alternatively, the Court will deny Claim 4(b) as procedurally defaulted.

Claim 4(g)

In Claim 4(g), Atkins claims that his federal constitutional rights were violated in the penalty phase of his trial because his trial counsel were ineffective "in the preparation and presentation of defense expert Dr. Colosimo." Fourth Amended Petition (ECF No. 183), pp. 186–92.

Here again, Atkins argues that he exhausted this claim in his first state habeas action. *See* Reply (ECF No. 222), pp. 117–18 ("There can be no good-faith argument that this claim is unexhausted."). The Court agrees. In his first state habeas action, Atkins claimed that his trial attorneys were ineffective because they "failed to adequately investigate, consult, or produce and offer psychological evidence at the trial." Supplemental Brief in Support of Petition, Exh. 232, p. 9 (ECF No. 94-13, p. 10); *see also id.* at 9–17. The state district court denied the claim. *See* Findings of Fact, Conclusions of Law and Order, Exh. 237 (ECF No. 94-18). On the appeal in Atkins' first state habeas action, the Nevada Supreme Court ruled:

> Atkins first claims that his trial counsel failed to adequately investigate Atkins' mental status.
>
> \*   \*   \*
>
> Atkins is not entitled to relief on these claims. First, pursuant to defense counsel's request, Atkins met with clinical psychologist Dr. Philip Colosimo six times. Dr. Colosimo conducted psychological testing of Atkins on three of those occasions, and estimated that he spent a total of nine hours with him. Dr. Colosimo provided defense counsel with his written report and testified at Atkins' penalty hearing in mitigation of punishment. Atkins has not indicated what material evidence would have been discovered through additional investigation into his mental status or how that evidence would have affected the outcome of his trial. Second, Dr. Colosimo explicitly concluded in his report that Atkins was competent at the time he committed the crimes. We therefore concluded that the record repels

1

Atkins' claims that his trial counsel's investigation or use of psychological evidence was objectively unreasonable and that he was prejudiced.

2

Order of Affirmance, Exh. 261, pp. 2–3 (ECF No. 94-43, pp. 3–4). The Nevada Supreme

3

Court's denial of relief on this claim was reasonable.

4

Dr. Colosimo testified that he determined that Atkins had "a schizo-effective

5

disorder which means that he has signs and symptoms [of] schizophrenia, disorganized

6

thinking, bizarre mentation, and affective problems—that is, he has depression

7

sometimes with some kind of manic activity, but mostly depressive by nature, with

8

paranoid thoughts." *See* Transcript of Trial, April 27, 1995, Exh. 147, p. 44 (ECF No. 92-

9

8, p. 48). He also testified that Atkins had "psychoactive substance dependence." *See*

10

*id.* at 44–45 (ECF No. 92-8, pp. 48–49). He testified further that Atkins had "antisocial

11

personality characteristics" and "narcissistic personality characteristics." *See id.* at 45

12

(ECF No. 92-8, p. 49). Dr. Colosimo testified that Atkins had "psycho-social stressers,

13

and that was determined to be social, socialization problems, emotional problems,

14

financial, general adjustment difficulties." *Id.* at 46 (ECF No. 92-8, p. 50). He testified

15

that Atkins has "psychiatric problems that exist throughout the day." *Id.* He testified that

16

along with "paranoid thinking, the delusional thinking, the bizarre mentations," Atkins

17

also reported hearing voices. *See id.* He testified that that Atkins said the voices were

18

not as loud when he was inside the prison. *See id.* Dr. Colosimo testified that Atkins'

19

intellectual function was at a low, second to third-grade, level, and that his IQ was well

20

below average. *See id.* at 47–48 (ECF No. 92-8, pp. 51–52). Dr. Colosimo testified that

21

Atkins also had attention deficit disorder. *See id.* at 48–49 (ECF No. 92-8, pp. 52–53).

22

He testified further as follows:

23

Q.    ... [D]o you believe Sterling Atkins perceives situations the same as you or I might perceive them?

24

A.    No, I don't.

25

Q.    Could you tell me a little bit about the differences?

26

27

A.    Sterling has been in and out of foster homes and prisons most of his life. He really gets very anxious, and of course, his impulsivity and his inability to attend to the laws of the society [that] he's operating in prevail.

28

When he is in prison or when he was in juvenile homes, Sterling seemed to enjoy those quite a bit, because he knew what his boundaries were. He knew how far he could go. And although at times he stated that he had some rough times being in these places, it seemed that – his history indicates that not long out of these places he was back in again and his probation periods were relatively short because of him being returned back to those places because of delinquent behaviors.

I think he sees the world as a very scary, anxious world. I think he sees it from a paranoid perspective. And he is very suspicious of others' intentions, and that accounts much for his anger and violence and in the way he impulsively does things in a violent way. He never really had the opportunity to have that structure built into his psyche. He's been primarily managed by outward control of his behaviors. And these in turn would – he would not show any type of criminal behavior on his part while in prison or being in juvenile homes.

He said the foster homes worked out for a little while, but he really wanted to get back to his parents. His parents would take him back for short periods of time and then be out of his life again, although not really providing the steadiness that ne needed.

     Q.    So you think he would adapt well to the control of the environments that is a prison?

     A.    Most certainly.

*Id.* at 50–51 (ECF No. 92-8, pp. 54–55).

Atkins parses Dr. Colosimo's testimony and pulls from it passages where his testimony could be construed as indicating Atkins was prone to unsocial or criminal behavior, and he argues that his counsel performed inadequately for eliciting such testimony, or for allowing it to come out on cross-examination. This Court, though, finds that, considered as a whole, Dr. Colosimo's testimony tended to help the defense in the penalty phase of the trial. Dr. Colosimo provided some psychological explanation for Atkins' behavior, and tied that explanation to the violence, abuse, neglect and dysfunction that Atkins grew up with, and that might arguably have mitigated his culpability, and his sentence. Extending to the Nevada Supreme Court the deference required under section 2254(d), and to trial counsel the deference required under *Strickland*, the Court determines that it could be argued that the Nevada Supreme Court could reasonably have found that trial counsel's performance with respect to the

1  presentation of Dr. Colosimo was not unreasonable, or that, at any rate, Atkins was not

2  prejudiced.

3  Alternatively, if the Court were to treat Claim 4(g) as unexhausted, presenting a

4  new claim in federal court, one that is technically exhausted but subject to procedural

5  default analysis, the Court would conclude that Atkins does not overcome the

6  procedural default under *Martinez*. The only new evidence in support of this claim,

7  presented in federal court but not in state court, is the following paragraph in a

8  declaration of Kent Kozal, one of Atkins' trial attorneys:

> Although I do not recall Dr. Colosimo specifically, I believe either a
> psychologist or psychiatrist was used in preparing Mr. Atkins' defense,
> and he testified during his penalty trial. I may have met with this doctor,
> and I got a sense from his testimony that he was upset because we
> should have consulted or prepped him more. I got the feeling that this
> doctor felt put on the spot during the hearing because we did not prep him
> enough for it.

13  Declaration of Kent Kozal, Pet. Exh. 63, p. 2 ¶10 (ECF No. 183-28, p. 3 ¶10). This

14  vague and incomplete recollection by trial counsel does not affect the Court's view of

15  this claim. The Court determines that Atkins was not prejudiced by his counsel in his

16  first state habeas action not supporting his claim with such a declaration. Atkins does

17  not show his trial counsel to have performed unreasonably with respect to the

18  presentation of Dr. Colosimo's testimony, or that he prejudiced by his trial counsel's

19  performance in that regard. Therefore, alternatively, the Court will deny Claim 4(g) as

20  procedurally defaulted.

21  <u>Claim 4(h)</u>

22  In Claim 4(h), Atkins claims that his federal constitutional rights were violated as

23  a result of ineffective assistance of his trial counsel because of "cumulative ineffective

24  assistance of counsel at the punishment phase." Fourth Amended Petition (ECF No.

25  183), p. 192. The Court determines that there was no attorney error as alleged in

26  Claims 4(b) and 4(g); therefore, there is no attorney error to be considered cumulatively,

27  and this claim fails. In the alternative, assuming, for the purpose of analysis, that trial

28  counsel performed below standard as alleged in Claims 4(b) and 4(g), and considering

1    those claims cumulatively with respect to the question of prejudice, the Court would find

2    that the Nevada Supreme Court reasonably determined that Atkins was not prejudiced.

3    There is no showing that absent these alleged errors of his counsel, considered

4    cumulatively, there would have been a reasonable probability of a different result in the

5    penalty phase of the trial. *See Strickland*, 466 U.S. at 688, 694. Or, stated differently,

6    the Nevada Supreme Court could reasonably have determined that these alleged

7    errors, considered cumulatively, did not deprive Atkins of a fair trial, with a reliable

8    result. *See id.* at 687. The Court will deny Atkins habeas corpus relief on Claim 4(h).

9            Claim 5

10           In Claim 5, Atkins claims that his constitutional rights were violated because "lead

11   counsel had a conflict of interest with her client that caused her to fail to request a

12   continuance." Fourth Amended Petition (ECF No. 183), pp. 193–96. Atkins claims that

13   the alleged conflict arose because when Melia was appointed five days before trial, she

14   was forced to decide whether to inform the trial court that she was unprepared and

15   would have to seek a continuance, and thereby risk not being appointed, and lose out

16   financially on the opportunity to take on Atkins' capital case, or proceed to trial

17   unprepared. *See id.*

18           Atkins concedes that this claim was not raised in state court as a stand-alone

19   claim. *See id.* at 196; *see also* Reply (ECF No. 222), pp. 130–32. The Court agrees and

20   determines that the claim is technically exhausted but subject to the procedural default

21   doctrine. The Court finds further that Atkins does not show cause and prejudice, by

22   showing ineffective assistance of either his appellate or state post-conviction counsel,

23   because the claim lacks merit.

24           Atkins argues that, because his claim is that his counsel had a conflict of interest,

25   he need not show resulting prejudice. *See* Fourth Amended Petition (ECF No. 183), pp.

26   195–96. The Court disagrees. The constitutional right to effective assistance of counsel

27   may be violated when a criminal defendant's counsel has a conflict of interest. *See*

28   *Mickens v. Taylor*, 535 U.S. 162, 166–70 (2002); *Cuyler v. Sullivan*, 446 U.S. 335, 345–

50 (1980). It is insufficient to show a mere possibility of a conflict; the petitioner must show an actual conflict that adversely affected counsel's performance. *See Mickens*, 535 U.S. at 172–74; *Cuyler*, 446 U.S. at 348–49. If counsel actively represents multiple defendants with conflicting interests, such that an actual conflict adversely affects counsel's performance, prejudice is presumed. *See Cuyler*, 446 U.S. at 349–50. However, the Supreme Court has instructed that *Cuyler* "does not clearly establish, or indeed even support ... expansive application" of that rule to cases outside the context of multiple concurrent representation. *Mickens*, 535 U.S. at 175. The presumption of prejudice only applies in the context of representation of multiple clients because of the "high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice." *Id.*

Atkins presents no evidence substantiating his assertion that Melia had an actual conflict of interest, that she was compelled to take the case and not seek a continuance because of personal financial considerations.

With respect to the question of prejudice, Atkins argues:

> As for prejudice, it has been discussed ... in the three claims devoted to ineffective assistance of counsel at the pre-trial guilt and punishment phases of the trial. Among other prejudicial events, trial counsel failed to have Mr. Atkins evaluated for competency until immediately prior to trial, thus foregoing a fair chance to show his incompetency; trial counsel had less than two hours to review juror questionnaires, resulting in a jury biased against Mr. Atkins; trial counsel's unpreparedness resulted in her denigrating the victim as a "hood rat," which led to the very damaging testimony of her father at the guilt phase; and there was the prejudicial testimony of Dr. Colosimo.

> *   *   *

> The numerous claims of ineffective assistance of trial counsel ... easily establish prejudice.

Fourth Amended Petition (ECF No. 183), pp. 195–96. As Atkins refers to his other claims of ineffective assistance as the alleged prejudice, this claim, much like Claims 1(a) and 4(a), is essentially background explanation and argument regarding his other claims, and is repetitive and redundant, and unnecessary as a separate claim. Or, viewed differently, it is essentially a cumulative error claim, incorporating allegations

presented in other claims in Atkins' petition, and is repetitive and redundant of Atkins' other cumulative error claims, and unnecessary as a separate claim.

Therefore, the Court determines that, as a stand-alone claim, Claim 5 is without merit. Atkins' appellate and state post-conviction counsel were not ineffective for not asserting this claim. Atkins does not show cause and prejudice relative to the procedural default. The claim will be denied as procedurally defaulted. The Court will, however, consider the allegations made by Atkins in Claim 5 in reviewing Atkins' other claims of ineffective assistance of trial counsel and his other cumulative error claims.

Claim 6

In Claim 6, Atkins claims that his federal constitutional rights were violated because of "prosecutorial misconduct under *Brady v. Maryland* and *Giglio v. United States* by failing to disclose deals made with the principal State's witnesses." Fourth Amended Petition (ECF No. 183), pp. 197–209. Claim 6 also includes a claim of ineffective assistance of trial counsel, for trial counsel's alleged failure to discover and obtain evidence of the deals that the prosecution allegedly made with the witnesses. *See id.* And, in the related part of Claim 13, Atkins claims that his counsel on his direct appeal was ineffective for not asserting, on his direct appeal, a claim like Claim 6. *Id.* at 293–94.

In his first state habeas action, Atkins claimed that the prosecution failed to turn over impeachment information regarding witnesses Michael Smith and Jerry Anderson, and that his trial counsel was ineffective for failing to obtain such information. *See* Supplemental Brief in Support of Petition, Exh. 232, pp. 40–43 (ECF No. 94-13, pp. 41–44). Atkins asserted "[o]n information and belief" that those witnesses "were offered incentives by the prosecution to provide evidence against the Petitioner." *Id.* at 41 (ECF No. 94-13, p. 42). Atkins also claimed that his appellate counsel was ineffective for not raising, on his direct appeal, the claims asserted in his petition. *See id.* at 56–57 (ECF No. 94-13, pp. 57–58). The state district court denied those claims, finding that Atkins'

trial counsel were aware of the previous or pending cases against Anderson and Smith,

and that there was no evidence that either received favorable treatment in return for

testimony in Atkins' case. *See* Findings of Fact, Conclusions of Law and Order, Exh.

237, pp. 24–26 (ECF No. 94-18, pp. 25–27). The state district court concluded:

> Based on the foregoing, Defendant fails to meet his burden in showing that counsels failed to request this information, that this information actually existed and that if it did exist that it would have had any [effect] on the credibility of Anderson or Smith at trial.

*Id.* at 26 (ECF No. 94-18, p. 27). Atkins then asserted these claims on his appeal in his

state habeas action. *See* Appellant's Opening Brief, Exh. 256, pp. 37–40, 66 (ECF No.

94-37, pp. 53–56, 82). The Nevada Supreme Court affirmed the denial of relief on these

claims, ruling as follows:

> ... Atkins contends that his trial counsel failed to file appropriate requests compelling prosecutors to divulge alleged inducements provided to State witnesses Michael E. Smith and Jerry Anderson. The record belies this claim. On April 18, 1994, defense counsel issued a subpoena to the custodian of records for LVMPD [Las Vegas Metropolitan Police Department] specifically requesting production of documents pertaining to Anderson's robbery arrest and a missing persons case in which he may have been involved. Defense counsel subsequently filed a discovery motion requesting "any and all *Brady* and *Giglio* material" [footnote omitted] with respect to both Smith and Anderson. In this motion, defense counsel indicated that Anderson had provided his statement to police concerning the instant murder incident to his arrest on traffic ticket bench warrants, and that he was thereafter released from custody. Also, in her cross-examination of Smith, defense counsel elicited that he had provided his statement to LVMPD officers incident to his arrest for offenses unrelated to the instant crimes, but that no charges were ever filed against him. Finally, to the extent that Atkins premises this allegation of ineffective assistance "[o]n information and belief ... that confidential informants and/or cooperating witnesses were offered incentives by the prosecution to provide evidence against [Atkins]," such speculation is insufficient to support Atkins' claim of ineffective assistance. We conclude that the record repels the claim that defense counsel's investigation into possible State-sponsored inducements to its witnesses fell below an objective standard of reasonableness or that Atkins was prejudiced.

Order of Affirmance, Exh. 261, p. 8 (ECF No. 94-43, p. 9). This Court determines that

the Nevada Supreme Court's ruling was reasonable.

"[T]he Constitution requires a fair trial, and one essential element of fairness is

the prosecution's obligation to turn over exculpatory evidence." *Milke v. Ryan*, 711 F.3d

998, 1002–03 (9th Cir. 2013) (citing *United State v. Bagley*, 473 U.S. 667, 674–75 (1985); *Giglio v. United States*, 405 U.S. 150, 153–55 (1972); *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). Under *Brady* and its progeny, the prosecution must disclose to the defense evidence favorable to the accused and material to either guilt or punishment; this requirement applies irrespective of the good faith or bad faith of the prosecution. *Brady*, 373 U.S. at 87; *see also United States v. Collins*, 551 F.3d 914, 923 (9th Cir. 2009). "Any evidence that would tend to call the government's case into doubt is favorable for *Brady* purposes." *Milke*, 711 at 1012 (citing *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). This includes material that would impeach a prosecution witness. *Id*. There are three elements of a *Brady* violation: (1) the state withholds evidence, either willfully or inadvertently, (2) the evidence withheld is favorable to the defendant, either because it is exculpatory or impeaching, and (3) the evidence is material. *See Strickler*, 527 U.S. at 281–82; *Milke*, 711 F.3d at 10112. In evaluating the effect of a *Brady* violation, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Atkins did not show in state court, and does not show here, that the prosecution had an agreement with Smith or Jerry Anderson, or provided either with any benefit in return for his testimony, or that any exculpatory or impeachment information was withheld from the defense. Atkins' *Brady* claim is speculative. Furthermore, Atkins makes no showing that his trial counsel performed unreasonably with respect to these issues. The Nevada Supreme Court reasonably rejected these claims. The Nevada Supreme Court's ruling was not contrary to, or any unreasonable application of, *Brady* or *Giglio*, or any other United States Supreme Court precedent.

1   With respect to the part of Claim 6 concerning an alleged agreement with witness

2   Mark Wattley, that claim was not presented in state court in Atkins' first state habeas

3   action, and it is subject to application of the procedural default doctrine. As with Jerry

4   Anderson and Smith, Atkins' does not make any showing that the prosecution had an

5   agreement with Wattley, that the prosecution provided Wattley with beneficial treatment

6   in return for his testimony, or that the prosecution withheld information from the defense

7   about any such arrangement. There is no showing that Atkins' state post-conviction

8   counsel was ineffective for not raising this issue in his first state habeas action. Atkins

9   does not make a showing of cause and prejudice with respect to these claims; they will

10  be denied as procedurally defaulted.

11          Claim 7(a) and the Related Part of Claim 13

12          In Claim 7(a), Atkins claims that his federal constitutional rights were violated

13  because "the trial court erred in denying defense counsels' motion challenging the

14  composition of the jury pool and Mr. Atkins' conviction" and because of "under

15  representation of African-Americans in the jury pool and on his jury." Fourth Amended

16  Petition (ECF No. 183), pp. 210–211. And, in the related part of Claim 13, Atkins claims

17  that his counsel on his direct appeal was ineffective for not asserting, on his direct

18  appeal, the claim in Claim 7(a). *Id.* at 293–94.

19          Atkins asserted such claims in his first state habeas action. *See* Supplemental

20  Brief in Support of Petition, Exh. 232, pp. 30–35, 56–57 (ECF No. 94-13, pp. 31–36, 57–

21  58). The state district court ruled the substantive claim to be procedurally barred

22  because it could have been raised on appeal. *See* Findings of Fact, Conclusions of Law

23  and Order, Exh. 237, p. 8 (ECF No. 94-18, p. 9). The court denied the claim of

24  ineffective assistance of appellate counsel, ruling that "[t]his claim would not have been

25  successful on appeal and therefore appellate counsel was not ineffective for failing to

26  raise it on appeal." *Id.* at 32–33 (ECF No 94-13, pp. 33–34). On the appeal in Atkins'

27  first state habeas action, the Nevada Supreme ruled the substantive claim procedurally

28  barred under state law. *See* Order of Affirmance, Exh. 261, p. 1 n.2 (ECF No. 94-43, p.

2 n.2). Regarding the claim of ineffective assistance of appellate counsel, the Nevada

Supreme Court ruled as follows:

> ... Atkins claims that his appellate counsel was ineffective for failing to raise on direct appeal that Atkins was denied his constitutional right to be tried by a jury composed of a fair cross-section of the community and for failing to challenge the district court's denial of a motion for discovery to develop this claim. In support of this contention, Atkins alleges that "the master list from which his petit jury was selected ... under represented black persons and other constitutionally cognizable groups that make up Clark County." He also asserts that "there were only three black Americans in the entire pool."
>
> To demonstrate a prima facie violation of the fair cross-section requirement, a defendant must demonstrate
>
> > (1) that the group alleged to be excluded is a 'distinctive group in the community; and (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. [Footnote: *Duren v. Missouri*, 439 U.S. 357, 364 (1979).]
>
> Atkins has failed to carry the burden of establishing a prima facie violation of this doctrine. [Footnote: *See Evans v. State*, 112 Nev. 1172, 1186, 926 P.2d 265, 275 (1996).] Although he has sufficiently identified a distinctive group, he has failed to carry his burden of establishing either underrepresentation or systemic exclusion. First, although he states that only three members of his jury panel appeared to be African-American, Atkins fails to otherwise provide the statistical data necessary for determining relative underrepresentation as required by the second prong of the *Duren* tripartite test. Second, Atkins has failed to demonstrate that the alleged underrepresentation was due to systemic exclusion of African-Americans in the jury selection process as required by the third prong. [Footnote: It appears that Atkins attempts to meet this third prong by suggesting that the State improperly used a peremptory challenge to exclude a potential juror based on his race. This is not the kind of evidence that supports a finding of systematic exclusion; rather, it is a separate and distinct issue requiring a different analysis than that required under *Duren. See Batson v. Kentucky*, 476 U.S. 79 (1986) (providing the basis for evaluating race-based objections to peremptory challenges).] Because Atkins has failed to establish a prima facie violation of the fair cross-section doctrine, we conclude that Atkins' appellate counsel was not ineffective for failing to raise this issue. We further conclude that Atkins failed to demonstrate that the district court abused its discretion in denying his motion for discovery.

*See* Order of Affirmance, Exh. 261, pp. 15–16 (ECF No. 94-43, pp. 16–17).

The Nevada Supreme Court's ruling was reasonable. "[T]he selection of a petit

jury from a representative cross section of the community is an essential component of

the Sixth Amendment right to a jury trial." *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975).

However, the Court in *Taylor* stated:

> It should also be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition, *Fay v. New York*, 332 U.S. 261, 284, 67 S.Ct. 1613, 1625, 91 L.Ed. 2043 (1947); *Apodaca v. Oregon*, 406 U.S., at 413, 92 S.Ct., at 1634 (plurality opinion); but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.

*Id.* at 538.  To make a prima facie showing that there has been violation of the defendant's right to a jury selected from a representative cross section of the community, the defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979). Under the third prong, the disproportionate exclusion need not be intentional to be unconstitutional, but it must be systematic. *See Randolph v. California*, 380 F.3d 1133, 1141 (9th Cir. 2004). Atkins has never made a colorable showing that African Americans were underrepresented in, or systematically excluded from, the venire from which his jury was chosen. The Nevada Supreme Court's ruling on this claim was not contrary to, or an unreasonable application of *Taylor* or *Duren*, or any other Supreme Court precedent. The Court will deny Atkins habeas corpus relief with respect to the claim of ineffective assistance of appellate counsel relative to this issue in Claim 13.

The substantive claim in Claim 7(a) is subject to denial as procedurally defaulted. As is discussed above, Atkins does not show ineffective assistance of his appellate counsel for failure to assert this claim on his direct appeal; therefore, he does not show cause and prejudice such as to overcome the procedural default. The Court will deny Claim 7(a) as procedurally defaulted.

60

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Claim 7(b) and the Related Part of Claim 13

In Claim 7(b), Atkins claims that his federal constitutional rights were violated because "the trial court erred in allowing hearsay statements made by Shawn Atkins to State's witness Mark Wattley." Fourth Amended Petition (ECF No. 183), pp. 211–214. In the related part of Claim 13, Atkins claims that his appellate counsel was ineffective for not asserting, on his direct appeal, the claim in Claim 7(b). *Id.* at 293–94.

When called as a witness at trial by the prosecution, Shawn Atkins testified that he and his brother, Atkins, were only minimally involved in Ebony's murder, and did not strike any of the blows that killed her. *See* Testimony of Shawn Atkins, Transcript of Trial, March 23, 1995, Exh. 129, pp. 28–35, 60–61 (ECF No. 91-33, pp. 33–40, 65–66). He testified that he only saw Atkins kick Ebony once, to see if she was conscious. *See id.* at 32 (ECF No. 91-33, p. 37). In essence, Shawn's testimony was that Doyle was the primary assailant who viciously attacked Ebony and killed her, without significant participation by Atkins. *See id.* at 28–35, 60–61 (ECF No. 91-33, pp. 33–40, 65–66).

Later in the trial, over Atkins' objection, the prosecution called Mark Wattley as a witness, to testify about statements that Shawn made to him. Wattley testified that Shawn told him that after he "jumped it off," Atkins and Doyle started "whooping on" Ebony, that they "went crazy, and they hit her in the head with a rock, stomped her, choked her with her pants leg." Testimony of Mark Wattley, Transcript of Trial, March 27, 1995, Exh. 133, p. 32 (ECF No. 91-39, p. 37). Wattley testified further as to what Shawn told him: "I guess, after they got through kicking her, he said Bubba [Atkins] tried to choke her with a pants leg around her, you know, neck, and then that's when Tony hit her in the head with a rock." *Id.* at 33 (ECF No. 91-39, p. 38).

On his direct appeal, Atkins claimed that the admission of Wattley's testimony about Shawn's statements was improper under state evidence law and violated his federal constitutional rights. *See* Appellant's Opening Brief, Exh. 181, pp. 10–20 (ECF No. 93-2, pp. 19–29). The Nevada Supreme Court denied relief on those claims; in its

1  opinion, the court discussed only Atkins' claims under state law. *See Atkins*, 112 Nev. at

2  1130–32, 923 P.2d at 1125–26.

3    The Nevada Supreme Court's ruling, under state law, regarding the admission of

4  Wattley's testimony is authoritative and beyond the scope of this federal habeas corpus

5  action. *See Bradshaw*, 546 U.S. at 76 ("[S]tate court's interpretation of state law,

6  including one announced on direct appeal of the challenged conviction, binds a federal

7  court sitting in habeas corpus.") (citing *Estelle*, 502 U.S. at 67–68).

8    Regarding the Nevada Supreme Court's denial of Atkins' claims under federal

9  law, because the Nevada Supreme Court provided no analysis of those claims, this

10  federal habeas court "must determine what arguments or theories supported or ... could

11  have supported, the state court's decision; and then it must ask whether it is possible

12  fairminded jurists could disagree that those arguments or theories are inconsistent with

13  the holding in a prior decision of this Court." *Richter*, 562 U.S. at 102. "Habeas relief is

14  available for wrongly admitted evidence only when the questioned evidence renders the

15  trial so fundamentally unfair as to violate federal due process." *Jeffries*, 5 F.3d at 1192.

16  However, "[t]he Supreme Court has made very few rulings regarding the admission of

17  evidence as a violation of due process." *Holley*, 568 F.3d at 1101. "Although the Court

18  has been clear that a writ should be issued when constitutional errors have rendered

19  the trial fundamentally unfair, it has not yet made a clear ruling that admission of

20  irrelevant or overly prejudicial evidence constitutes a due process violation sufficient to

21  warrant issuance of the writ." *Id.* (internal citation omitted). Atkins does not point to any

22  clearly established federal law, as determined by the Supreme Court, holding that

23  admission of testimony such as that at issue here violates a defendant's right to due

24  process of law. In fact, Atkins makes no argument at all, beyond generalized claims of

25  violation of his due process rights, in support of his federal law claim. *See* Reply (ECF

26  No. 222), p. 153. Atkins does not show that the Nevada Supreme Court's ruling was an

27  unreasonable application of Supreme Court precedent, such as to warrant habeas relief

28  under 28 U.S.C. § 2254(d). Wattley's testimony about what Shawn told him was not so

unfairly prejudicial as to render Atkins' trial fundamentally unfair. The Court will deny Atkins habeas corpus relief with respect to Claim 7(b).

Turning to the related claim of ineffective assistance of appellate counsel in Claim 13, that claim was raised in state court, in Atkins' first state habeas action (*see* Supplemental Brief in Support of Petition, Exh. 232, pp. 61–64, 56–57 (ECF No. 94-13, pp. 62–65, 57–58); Appellant's Opening Brief, Exh. 256, pp. 66, 69 (ECF No. 94-38, pp. 19, 22), and the Nevada Supreme Court affirmed the denial of the claim without discussion. *See* Order of Affirmance, Exh. 261 (ECF No. 94-43). This claim is without merit and the Nevada Supreme Court's denial of it was reasonable. Atkins' appellate counsel did in fact assert the claim regarding Wattley's testimony on Atkins' appeal, and Atkins makes no argument regarding what further his appellate counsel should have done in that regard. The Court will deny Atkins habeas corpus relief on the part of Claim 13 asserting that appellate counsel was ineffective for not claiming on Atkins' appeal that Wattley's testimony about Shawn's statements violated his federal constitutional rights.

Claim 7(c) and the Related Part of Claim 13

In Claim 7(c), Atkins claims that his federal constitutional rights were violated because "the trial court erred in not allowing the defense a continuance." Fourth Amended Petition (ECF No. 183), pp. 215–217. And, in the related part of Claim 13, Atkins claims that his counsel on his direct appeal was ineffective for not asserting, on his direct appeal, the claim in Claim 7(c). *Id.* at 293–94.

Atkins concedes that the substantive claim, Claim 7(c), "does not seem to have been brought in state court." *Id.* at 217. In fact, however, Atkins did raise the claim on the appeal in his first state habeas action, but the Nevada Supreme Court ruled it to be procedurally barred. *See* Appellant's Opening Brief, Exh. 256, pp. 19–21 (ECF No. 94-37, pp. 35–37); Order of Affirmance, Exh. 261, p. 1 n.2 (ECF No. 94-43, p. 2 n.2). Either way, the claim is subject to the procedural default doctrine, and the question is whether Atkins shows cause and prejudice to overcome the procedural default.

Atkins raised the related claim of ineffective assistance of appellate counsel in Claim 13 in his first state habeas action. *See* Supplemental Brief in Support of Petition, Exh. 232, pp. 21–24, 56–57 (ECF No. 94-13, pp. 22–25, 57–58); Appellant's Opening Brief, Exh. 256, pp. 19–21, 66 (ECF No. 94-37, pp. 35–37; ECF No. 94-38, p. 19). The Nevada Supreme Court denied relief on that claim as follows:

> ... Atkins alleges that his appellate attorney failed to contend that the district court erred in denying Atkins' pretrial motion for continuance. Approximately one month before the scheduled start of Atkins' trial, lead defense attorney Anthony P. Sgro filed a motion for continuance due to a conflict that had developed with another capital case in which he was also defense counsel. Approximately eleven days before Atkins' trial, the district court denied the motion. The following day, Atkins filed a motion to allow substitution of attorneys in which he requested the reappointment of former co-counsel Laura Melia, who had withdrawn from the case following Atkins' preliminary hearing. The district court granted this motion approximately one week prior to the commencement of Atkins' trial. On March 20, 1995, after jury voir dire had begun, Atkins expressed concern to the district court that Ms. Melia was not adequately prepared to defend him. Then, at the close of the guilt phase of his trial, Atkins stated that he felt rushed to trial.

> Based upon our review of the record, we conclude that the district court's denial of Mr. Sgro's motion to continue Atkins' trial did not constitute an abuse of discretion. [Footnote: *See Wesley v. State*, 112 Nev. 503, 511, 916 P.2d 793, 799 (1996) ("The decision to grant or deny trial continuances is within the sound discretion of the district court and will not be disturbed absent a clear abuse of discretion.").] First, the record indicates that Ms. Melia was qualified to represent a capital defendant and that Mr. Sgro endorsed her return to Atkins' case. Also, in response to Atkins' statement of March 20, the district court stated that Ms. Melia was familiar with the case, having performed as co-counsel through Atkins' preliminary hearing. In response to Atkins' comment at the close of the guilt phase of his trial, the district court stated that Ms. Melia never indicated that she was not adequately prepared to proceed with Atkins' defense but had she so indicated "this court would not have excused Mr. Sgro." Ms. Melia then interjected that she continued to believe that she was adequately prepared to represent Atkins. Thus, the record indicates that the district court properly acted within its discretion, and we conclude that appellate counsel was not ineffective for failing to challenge the district court's denial of Mr. Sgro's motion for continuance.

Order of Affirmance, Exh. 261, pp. 10–11 (ECF No. 94-43, pp. 11–12).

Atkins does not show the Nevada Supreme Court's ruling on his claim of ineffective assistance of appellate counsel to be unreasonable. The Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, *Strickland*, or any other Supreme Court precedent, and was not unreasonable in view of the evidence.

The Court will deny Atkins habeas corpus relief on this claim of ineffective assistance of his appellate counsel.

Returning to the substantive claim in Claim 7(c), that claim is procedurally defaulted, and Atkins does not show cause and prejudice with respect to it. Atkins does not show that his appellate counsel was ineffective for not asserting the claim on his direct appeal. And, moreover, Atkins does not show the substantive claim—that his federal constitutional rights were violated by the denial of a continuance—to have any merit. The only authority Atkins cites in support of the claim, beyond citation to the constitutional provisions he claims were violated, is *Ungar v. Sarafite*, 376 U.S. 575 (1964). *See* Reply (ECF No. 222), p. 155. The Court in *Ungar* stated the following about when denial of a continuance might violate a defendant's constitutional right to due process of law:

> The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. *Avery v. Alabama*, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. *Chandler v. Fretag*, 348 U.S. 3, 75 S.Ct. 1, 99 L.Ed. 4. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied. *Nilva v. United States*, 352 U.S 385, 77 S.Ct. 431, 1 L.Ed.2d 415; *Torres v. United States*, 270 F.2d 252 (C.A.9th Cir.); cf. *United States v. Arlen*, 252 F.2d 491 (C.A.2d Cir.).

*Ungar*, 376 U.S. at 589–90. Under the facts in this case, where the trial judge denied the continuance and replaced one of Atkins' attorneys with an attorney who had represented him through his preliminary hearing and said she was prepared for trial, denial of a continuance was not so arbitrary that Atkins' federal constitutional right to due process of law was violated, and Atkins' appellate counsel was not ineffective for not asserting this claim on his direct appeal. Atkins does not show cause and prejudice relative to the procedural default of Claim 7(c). Claim 7(c) will be denied as procedurally defaulted.

Claim 7(f) and the Related Part of Claim 13

In Claim 7(f), Atkins claims that his federal constitutional rights were violated on account of "trial court error for allowing prosecutorial misconduct in final punishment phase argument and prosecutorial misconduct for the argument." Fourth Amended Petition (ECF No. 183), pp. 222–26. And, in the related part of Claim 13, Atkins claims that his counsel on his direct appeal was ineffective for not asserting, on his direct appeal, the claim in Claim 7(f). *Id.* at 293–94.

Atkins claims that his federal constitutional rights were violated because the prosecutors made the following comments to the jury in closing arguments in the penalty phase of the trial:

1. "Ebony Mason's parents can visit Ebony Mason, but they have to go to the cemetery to visit their young child." Transcript of Trial, April 27, 1995, Exh. 147, p. 107 (ECF No. 92-9, p. 26) (court struck comment and admonished jury to disregard).

2 "[T]he Defendant has already stabbed someone in the back, brutally murdered a young woman within a span of about two years. Where does he go from here? What does he do for an encore?" *Id.* at 109 (ECF No. 92-9, p. 28) (court sustained objection and admonished jury to disregard).

3. "The shorter the sentence, the sooner this community will find out." *Id.* (ECF No. 92-9, p. 28) (court sustained objection and admonished jury to disregard).

4. "And this community deserves...." *Id.* (ECF No. 92-9, p. 28) (court cut off prosecutor, sustained objection, and admonished jury to disregard).

5 "Deterrence is achieved through severity of punishment. It is important for the image of the criminal justice system, for those who view how it works, that they understand that lines are drawn that you don't go over. On January 15th, 1994 this Defendant went over the line. A sentence of death will send a strong message to the future Sterling Bubba Scarface Atkins of the world." *Id.* at 110–11 (ECF No. 92-9, pp. 29–30).

6. "We should use the criminal justice system to protect society from physical danger. We should be ashamed and alarmed to live in a society that does not express through its institutions the public's proper sense [of] proportionate punishment for those people such as the Defendant. Preserving the life of a cold-blooded murderer compromises the value of life." *Id.* at 111 (ECF No. 92-9, p. 30).

7 "[C]apital punishment is essential in an ordered society such as this that allows its citizens to rely on the legal process rather than self-help." *Id.* (ECF No. 92-9, p. 30).

8. "It would be easy for you to sentence the Defendant to life in prison without the possibility of parole and be done with it. That would not do justice to the facts of this case based upon the evidence." *Id.* at 112 (ECF No. 92-9, p. 31).

9. "Failure to condemn crime has the effect of condoning it. Justice requires criminals get what they deserve, and what criminals deserve is based upon what they did." *Id.* (ECF No. 92-9, p. 31).

10. "A sentence of death would do justice to the facts of this case and give value to the life of Ebony Mason." *Id.* at 113 (ECF No. 92-9, p. 32).

11. "Someone once said that, 'Our human capacity for good makes the death penalty tragic, but our human capacity for evil makes it necessary.'" *Id.* (ECF No. 92-9, p. 32).

12. "The return of a death verdict is society's act of self-defense. The return of a death verdict is the enforcement of society's right to be free from murder." *Id.* (ECF No. 92-9, p. 32).

13. "You can feel good about a verdict of death. You can hold your head up high when you walk out of this building. If asked what you did down at the courthouse in the case of *State v. Sterling Atkins*, you can respond by saying you heard evidence about a man who kidnapped and sexually assaulted a young mother of two, a man who participated in the shoving of a stick into the rectum of that poor young woman, a man who left foot impressions on her body, a man who did all this while on parole for yet another violent felony that he had committed. If asked what you did on that case you can respond by saying you found the Defendant guilty of first-degree murder and you sentenced him to death. That's what you did down at the courthouse in the case of *State v. Sterling Atkins*. You can reply by saying you did justice in that case." *Id.* at 114 (ECF No. 92-9, p. 33).

14. "[T]he only way the law can be made sacred is to entitle it to inflict the penalty of death." *Id.* (ECF No. 92-9, p. 33).

15. "What is the act that the Defense wants to mitigate here? It's been the position of the Defense throughout this case that Sterling didn't participate in the death of Ebony Mason. So why the talk of mitigation? On the one hand they seem to be saying, 'He didn't do it;' and on the other they're saying, 'Well if he did it, then this is why.'" *Id.* at 128 (ECF No. 92-9, p. 47) (court sustained objection).

16. "The torture aggravator brings this point out. This wasn't just a bullet in the head. Hit over the head; she's knocked out; she dies. She was savaged for a period, a significant period, of time by a group of individuals. How many times during this period of time as she was clawing, trying to get up, trying to fight [off] her attackers, dragged across the ground, beaten, stomped, how many times did Ebony think 'This is it? I'm dead; this is it.'" *Id.* at 130–31 (ECF No. 92-9, pp. 49–50) (objection overruled).

17. "There was the stomping. Nine ribs broken, any one of which capable of producing serious injury or death. How many times did Ebony suffer death as these different individuals took turns jumping on her? And then lying there while somebody got something to put around her neck—a pair of pants—where she was choked, perhaps to unconsciousness. What was

1

2

going through her mind? And then, that not working, somebody finding a rock and her repeatedly being struck in the head with that rock." *Id.* at 131 (ECF No. 92-9, p. 50).

3

18. "And in a civilized society you have to hold people responsible for their conduct. What's the alternative? Chaos." *Id.* at 137 (ECF No. 92-9, p. 56).

4

Fourth Amended Petition (ECF No. 183), pp. 222–24. Atkins also cites comments made

5

by the prosecutors regarding the potential sentence of life without the possibility of

6

parole (*Id.* at 225); those comments are considered, below, in the context of Claim 10.

7

Atkins argues that the prosecutors' comments were improper because they were

8

"designed to appeal to the passions, fears and vulnerabilities of the jury," citing *United*

9

*States v. Koon,* 34 F.3d 1416 (9th Cir. 1994), *rev'd on other grounds*, 518 U.S. 81

10

(1996), and because they "point[ed] to a particular crisis in our society and ask[ed] the

11

jury to make a statement," citing *United States v. Leon-Reyes*, 177 F.3d 816 (9th Cir.

12

1999). *See* Fourth Amended Petition (ECF No. 183), pp. 225–26; *see also* Reply (ECF

13

No. 222), pp. 168–70.

14

Atkins asserted this claim—the claim in Claim 7(f)—in state court on his direct

15

appeal. *See* Appellant's Opening Brief, Exh. 181, pp. 51–57 (ECF No. 93-34 pp. 3–9).

16

The Nevada Supreme Court denied Atkins relief, ruling as follows:

17

18

Atkins also contends that the prosecutor's comments during closing argument of the penalty phase amount to prosecutorial misconduct.

19

20

21

22

23

24

25

26

"[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Young*, 470 U.S. 1, 11, 105 S. Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). In addition, should this court determine that improper comments were made by the prosecutor, "it must be determined whether the errors were harmless beyond a reasonable doubt." *Witherow v. State*, 104 Nev. 721, 724, 765 P.2d 1153, 1155 (1988). It is not enough that the prosecutor's remarks are undesirable. *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471, 91 L.Ed.2d 144 (1986). The Constitution guarantees a fair trial, not necessarily a perfect trial. *Ross v. State*, 106 Nev. 924, 927, 803 P.2d 1104 (1990). Thus, the relevant inquiry is whether the prosecutor's statements so infected the proceedings with unfairness as to make the results a denial of due process. *Darden*, 477 U.S. at 181, 106 S. Ct. at 2471.

27

28

Atkins contends that during closing argument of the penalty phase, the prosecutor inflamed the passion of the jury with the following remarks:

Consider this in contrast to Ebony Mason. She will never see her children again or hear their laughter. She will never experience the joy of watching her children grow up, get an education, get married, have children of their own. She will never again be able to watch the sunrise or the sunset. [Objection overruled.]

She will never again listen to music or read a book. She will never again see her mother, her father, her grandmother, her brother, or her sister and, of course, her children. Ebony Mason's parents can visit Ebony Mason, but they have to go to the cemetery to visit their young child. [Court: "Counsel, the last part, I will strike that. The jury is admonished to disregard the last statement.["]]

While prison life within those walls might not be easy, within those walls, there is life, and where there is life, there is hope. What would Ebony Mason give to be in a situation where she could see her parents? [Objection overruled.]

What would Ebony Mason give to be in a situation where she could hug her children, where she could see the sunrise and sunset. What would Ebony Mason give just to be alive?

\* \* \*

The Defendant has already stabbed someone in the back, brutally murdered a young woman within a span of about two years. Where does he go from here? What does he do for an encore? [Objection sustained.]

The shorter the sentence, the sooner this community will find out. [Objection sustained.]

\* \* \*

This wasn't just a bullet in the head. Hit over the head; she's knocked out; she dies. She was savaged for a period, a significant period of time, by a group of individuals. How many times during this period of time as she was clawing, trying to get up, trying to fight off her attackers, dragged across the ground, beaten, stomped, how many times did Ebony think, "This is it? I'm dead; this is it." [Objection overruled.]

We conclude that the aforementioned closing arguments by the prosecutor during the penalty phase were proper as they described the impact of the crime on the victim and her family. *Payne v. Tennessee*, 501 U.S. 808, 111 S. Ct. 2597, 115 L.Ed.2d 720 (1991). In *Homick v. State*, 108 Nev. 127, 825 P.2d 600 (1992), this court "applaud[ed] the decision in *Payne* as a positive contribution to capital sentencing, and conclud[ed] that it fully comports with the intendment of the Nevada Constitution." *Id.* at 136, 825 P.2d at 606. This court reasoned:

The key to criminal sentencing in capital cases is the ability of the sentencer to focus upon and consider both the

individual characteristics of the defendant and the nature and impact of the crime he committed. Only then can the sentencer truly weigh the evidence before it and determine a defendant's just desserts. Apropos to the point is the statement by the venerable Justice Cardozo in *Snyder v. Massachusetts*, 291 U.S. 97, 122 [54 S. Ct. 330, 338, 78 L.Ed. 674] (1934), that "justice, though due to the accused is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true."

*Id.* at 137, 825 P.2d at 606. The contested arguments related specifically to the impact of the crime on Ebony Mason and her family. They described to the jury the nature and the impact of the crime committed. We conclude that they do not constitute prosecutorial misconduct.

Atkins further contends that the prosecutor committed misconduct by impermissibly arguing that the jury should return a verdict of death in order to please the jury members' friends and neighbors. He cites *Collier v. State*, 101 Nev. 473, 705 P.2d 1126 (1985), in support of his position. In *Collier*, this court disapproved of a prosecutor's statement to the jury that it must be angry with the defendant or else "we are not a moral community." *Id.* at 479, 705 P.2d at 1129–30. This court found this comment, among others, to be a blatant attempt to inflame the jury and an inappropriate encouragement to approach their duties with anger. *Id.* This court rejected the State's contention that general comments about community standards are proper. *Id.*

In the instant case, the prosecutor stated the following during closing argument:

You can feel good about a verdict of death. You can hold your head up high when you walk out of this building. If asked what you did down at the courthouse in the case, *State v. Sterling Atkins*, you can respond by saying you heard evidence about a man who kidnapped and sexually assaulted a young mother of two, a man who participated in the shoving of a stick into the rectum of that poor young woman, a man who left foot impressions on her body, a man who did all this while on parole for yet another violent felony that he committed. If asked what you did on that case you can respond by saying you found the Defendant guilty of first degree murder and you sentenced him to death. That's what you did down at the courthouse in the case of *State v. Sterling Atkins*. You can reply by saying you did justice in that case.

We conclude that the prosecutor's comments in the instant case do not rise to the level of those in *Collier*. Rather, the prosecution sought to persuade the jury to do justice in this particular case. Accordingly, we conclude that there was no prosecutorial misconduct.

*Atkins*, 112 Nev. at 1135–37, 923 P.2d at 1127–29.

Atkins does not show the Nevada Supreme Court's ruling to be contrary to, or an unreasonable application of, United States Supreme Court precedent. In support of his argument, Atkins cites *Koon* and *Leon-Reyes*, both of which are Ninth Circuit Court of Appeals cases. *See* Fourth Amended Petition (ECF No. 183), pp. 225–26; *see also* Reply (ECF No. 222), pp. 168–70. In both *Koon* and *Leon-Reyes*, the court of appeals cited *Viereck v. United States*, 318 U.S. 236, 247–48 (1943) for the general proposition that "[p]rosecutors may not make comments calculated to arouse the passions or the prejudices of the jury." *Leon-Reyes*, 177 F.3d at 823; *Koon*, 34 F.3d at 1443. Atkins does not make any showing that it was unreasonable for the Nevada Supreme Court to determine that the prosecutors in this case did not violate that proscription. And, Atkins does not point to any other Supreme Court support for his argument.

In Claim 7(f), Atkins cites portions of the prosecutors' arguments that he did not contest in state court. The new factual allegations in Claim 7(f), however, do not "fundamentally alter" the claim. *See Vasquez*, 474 U.S. at 260. The new allegations do not place the claim in a significantly different and stronger evidentiary posture than it was when the state courts considered it. *See Dickens*, 740 F.3d at 1318.

Alternatively, if the new allegations are viewed as fundamentally altering Claim 7(f), or placing it in a significantly different and stronger evidentiary posture, such that the claim is, in part, subject to the procedural default doctrine, the Court would conclude that Atkins' appellate counsel was not ineffective within the meaning of *Strickland* for not including those additional factual allegations in Atkins' claim on his direct appeal. The Court would determine, then, that Atkins does not show cause for the procedural default, and would deny the claim, as to the new allegations, as procedurally defaulted.

Atkins asserted his claim of ineffective assistance of his appellate counsel in state court, in his first state habeas action. *See* Supplemental Brief in Support of Petition, Exh. 232, pp. 56–57, 71–75 (ECF No. 94-13, pp. 57–58, 72–76); Appellant's Opening Brief, Exh. 256, pp. 66, 70 (ECF No. 94-38, pp. 19, 23). The Nevada Supreme Court denied relief on that claim without discussion. *See* Order of Affirmance, Exh. 261

(ECF No. 94-43). As is discussed above, Atkins' appellate counsel did in fact assert a claim like that in Claim 7(f) on his direct appeal. The Nevada Supreme could reasonably have determined that the comments of the prosecutors Atkins now adds to his claim were not so unfairly prejudicial as to amount to a violation of Atkins' federal constitutional right to due process of law, and that, therefore, his appellate counsel was not ineffective for not raising an issue regarding the newly added comments. Affording the Nevada Supreme Court's ruling the deference required under section 2254(d), the Court finds that the ruling was not contrary to, or an unreasonable application of, *Strickland* or any other United States Supreme Court precedent. The Court will deny Atkins relief on the part of Claim 13 in which he claims his appellate counsel was ineffective vis-à-vis the claims in Claim 7(f).

Claim 9(C)(iii) and the Related Part of Claim 13

In Claim 9, Atkins claims that Atkins' federal constitutional rights were violated because "Nevada's unconstitutional common law definitions of the elements of the capital offense are unconstitutional and many of the aggravating factors were invalid." Fourth Amended Petition (ECF No. 183), pp. 235–62. In the part of Claim 9 designated Claim 9(C)(iii), Atkins claims that "the use of the first and second aggravators, that the murder was committed by a person who was previously convicted of a felony [involving the use or threat of violence to the person of another] and the murder was committed by a person under a sentence of imprisonment were duplicative and hence also unconstitutional." *Id.* at 241–42. In the September 28, 2017, order, ruling on Respondents' motion to dismiss, the Court dismissed the remainder of Claim 9 on statute of limitations grounds. *See* Order (ECF No. 214), pp. 26–27. In the part of Claim 13 related to Claim 9(C)(iii), Atkins claims that his counsel on his direct appeal was ineffective for not asserting, on his direct appeal, the claim in Claim 9(C)(iii). *Id.* at 293–94.

Atkins did not assert a claim like Claim 9(C)(iii) on his direct appeal. *See* Appellant's Opening Brief, Exh. 181 (ECF No. 93-34).

In his first state habeas action, Atkins asserted the claim that his appellate counsel was ineffective for not including on his direct appeal the claim in Claim 9(C)(iii). *See* Supplemental Brief in Support of Petition, Exh. 232, pp. 53–54, 56–57 (ECF No. 94-13, pp. 54–55, 57–58); Appellant's Opening Brief, Exh. 256, pp. 62–63, 66 (ECF No. 94-38, pp. 15–16, 19). The Nevada Supreme Court ruled on that claim of ineffective assistance of appellate counsel as follows:

> ... Atkins claims that his appellate counsel was ineffective for failing to argue that Atkins' death sentence is unconstitutional "due to the finding of the duplicative aggravating circumstances that (1) the murder was committed by a person who was previously convicted of a felony involving the use or threat of violence; and (2) that the murder was committed by a person under sentence of imprisonment." Atkins contends that these aggravators are duplicative because they are both based upon his prior conviction for assault with use of a deadly weapon. [Footnote: Atkins committed the instant crimes while on parole from this conviction.] Atkins' claim is without merit. The fact that these two aggravators arise out of the same prior conviction does not render the aggravators duplicative because they "could, hypothetically, be based upon completely different circumstances and ... they address different state interests." [Footnote: *Geary v. State*, 112 Nev. 1434, 1448, 930 P.2d 719, 728 (1996).] Thus, Atkins' claim of ineffective assistance of appellate counsel must fail because the issue did not have a reasonable probability of success on appeal.

Order of Affirmance, Exh. 261, pp. 14–15 (ECF No. 94-43, pp. 15–16).

Atkins does not show this ruling, on his claim of ineffective assistance of appellate counsel, to be unreasonable in light of Supreme Court precedent. Atkins does not show that the two aggravating circumstances are duplicative, and, at any rate, he cites no Supreme Court precedent supporting his contention that duplicative aggravating circumstances violate a capital defendant's federal constitutional rights. Atkins does not show that the Nevada Supreme Court's ruling was unreasonable under *Strickland*. Therefore, applying section 2254(d), the Court will deny Atkins relief on the part of Claim 13 related to Claim 9(C)(iii).

Turning to Claim 9(C)(iii) itself, because that claim was not raised on Atkins' direct appeal it is subject to the procedural default doctrine here. The Court agrees with the Nevada Supreme Court's conclusion that Atkins' appellate counsel was not ineffective for failing to raise the claim, as Atkins does not show that the aggravating

circumstances at issue were duplicative or that duplicative aggravating circumstances are violative of a defendant's federal constitutional rights. Atkins does not show cause and prejudice for the procedural default. Claim 9(C)(iii) will be denied as procedurally defaulted.

<u>Claim 10 and the Related Part of Claim 13</u>

In Claim 10, Atkins claims that his federal constitutional rights were violated because "the trial court erred in allowing the jury to speculate that Atkins could be paroled or granted clemency if he received a sentence of life without the possibility of parole." Fourth Amended Petition (ECF No. 183), pp. 263–69. In the part of Claim 13 related to Claim 10, Atkins claims that his counsel on his direct appeal was ineffective for not asserting the claim in Claim 10. *Id.* at 293–94.

Atkins did not assert a claim like Claim 10 on his direct appeal. *See* Appellant's Opening Brief, Exh. 181 (ECF No. 93-34). In his first state habeas action, Atkins asserted the claim that his appellate counsel was ineffective for not including in his direct appeal a claim like that in Claim 10. *See* Supplemental Brief in Support of Petition, Exh. 232, pp. 57–59 (ECF No. 94-13, pp. 58–60); Appellant's Opening Brief, Exh. 256, pp. 67–68 (ECF No. 94-38, pp. 20–21). The Nevada Supreme Court ruled on that claim of ineffective assistance of appellate counsel as follows:

> ... Atkins contends that his appellate counsel failed to raise the issue of an alleged instance of prosecutorial misconduct. The State elicited testimony from a defense witness, a retired prison warden, that the Pardons Board could commute a sentence of life without the possibility of parole to a sentence of life with the possibility of parole. Atkins characterizes this as a "misstatement of the powers" of the Pardons Board that "may have convinced the jury that the only way to keep [Atkins] off the street was to kill him." [Footnote omitted.] We conclude that Atkins has failed to identify a "misstatement" of the Pardons Board's powers. NRS 213.085, which precludes the Pardons Board from commuting a sentence of death or life imprisonment without possibility of parole to a sentence that would allow parole, became effective on July 1, 1995, and this court has held that a retroactive application of the statute is unconstitutional. [Footnote: *Miller v. Warden*, 112 Nev. 930, 921 P.2d 882 (1996).] Atkins was convicted in June 1995. Accordingly, had Atkins' jury sentenced him to life without the possibility of parole, he would have been eligible for commutation of his sentence by the Pardons Board to a sentence of life with the possibility of parole. [*See Smith v. State*, 106 Nev. 781, 802 P.2d 628 (1990) (holding that pursuant to NRS 213.1099(4) and Nev. Const. art

5, § 4(2) the Board of Pardons may commute a sentence of life without parole to a sentence allowing for parole).

Order of Affirmance, Exh. 261, p. 13 (ECF No. 94-43, p. 14). The ruling of the Nevada Supreme Court was reasonable.

The trial court instructed the jury, in the penalty phase of Atkins' trial, as follows:

> Life imprisonment with the possibility of parole is a sentence of life imprisonment which provides that a defendant would be eligible for parole after a period of ten years. This does not mean that he would be paroled after ten years, but only that he would be eligible after that period of time.

> Life imprisonment without the possibility of parole means exactly what it says, that a defendant shall not be eligible for parole.

> If you sentence a defendant to death, you must assume that the sentence will be carried out.

> Although under certain circumstances and conditions the State Board of Pardons Commissioners has the power to modify sentences, you are instructed that you may not speculate as to whether the sentence you impose may be changed at a later date.

Jury Instructions, Exh. 149, Instruction No. 17 (ECF No. 92-11, p. 19). The prosecutors made arguments in their closing arguments consistent with this instruction, including the following:

> It was mentioned several times—a minute ago by counsel for the Defense—that you have an instruction which correctly states that life without the possibility of parole means life without the possibility of parole. And that's true. And life with the possibility of parole means life with the possibility of parole. But the instruction that comes right after that gives a little explanation of what seems to have been a conflict in what we've been hearing here, and that is that life without the possibility of parole can become life with the possibility of parole at some point down the road based upon the activities of the pardons board.

> *   *   *

> You're not supposed to speculate about whether that will happen in this particular case. The instructions will tell you you can't speculate. You're not supposed to go back and say "Is this going to be pardoned if we give him life without parole? Is some pardons board later down the road going to give him life with?" You can't do that. Okay? That would be a violation of the law. But you are entitled to know that that is provided for in our law. Anything less than that knowledge to you would be unfair.

Transcript of Trial, April 27, 1995, Exh. 147, pp. 137–39 (ECF No. 92-9, pp. 56–58).

Jury instructions that inform the jury of the possibility of commutation of a sentence of life without the possibility of parole to a life sentence with the possibility of

parole may not violate the federal Constitution if the instructions are accurate. *California v. Ramos,* 463 U.S. 992, 1004 (1983). However, an instruction that is accurate in the abstract might nonetheless violate the Constitution if it is misleading given the facts of the particular case. *See Coleman v. Calderon,* 210 F.3d 1047, 1050–51 (9th Cir. 2000) ("[I]nstruction was misleading because it told the jury that the Governor had the power to commute Coleman's sentence but left out the additional hurdles to be overcome to obtain such a commutation."); *Gallego v. McDaniel,* 124 F.3d 1065, 1074–77 (9th Cir.1997) (instruction misleading because defendant was under sentence of death in another jurisdiction, essentially ruling out any possibility of parole). Furthermore, even where an instruction regarding the possibility of executive clemency is accurate, a prosecutor's inflammatory or misleading arguments on the subject may violate the defendant's federal constitutional rights. *See Sechrest v. Ignacio*, 549 F.3d 789, 807–12 (9th Cir. 2008).

The Nevada Supreme Court ruled that the jury instruction at issue in this case did not misstate Nevada law. This federal habeas court does not review state court rulings on matters of state law. *See Bradshaw*, 546 U.S. at 76. And, Atkins makes no showing that the jury instruction was inaccurate, misleading, or confusing, given his particular circumstances, or that it otherwise violated his federal constitutional rights. *See Ramos*, 463 U.S. at 1009 (emphasizing importance of accuracy of jury instructions regarding possibility of commutation of a sentence of life without the possibility of parole).

Nor does Atkins show that the prosecutors committed misconduct in their arguments to the jury on the subject, such as to render Atkins' trial unfair and violate his federal constitutional rights. The prosecutors did little more than restate the jury instruction. The prosecutors did not comment on the likelihood that Atkins' sentence would be commuted to one allowing parole or the likelihood that parole would be granted. The prosecutors stated that the jury was not to speculate about that. *Cf. Sechrest*, 549 F.3d at 812 (describing the prosecutor's arguments in that case as

"erroneous," and stating that the prosecutor "misled the jurors."). There was no prosecutorial misconduct as claimed by Atkins.

Under the circumstances here, affording the state court ruling the deference required under 28 U.S.C. §2254(d), and affording Atkins' appellate counsel the deference required under *Strickland*, the Court will deny Atkins habeas corpus relief on the claim of ineffective assistance of appellate counsel in Claim 13, in which he claims that his appellate counsel was ineffective for failing to raise on his direct appeal a claim regarding the jury instruction and prosecution arguments regarding the possibility that the Board of Pardons could commute a sentence of life without the possibility of parole to a sentence of life with the possibility of parole.

As for the substantive claim in Claim 10—that Atkins was denied his due process right to a fair trial by the jury instruction and prosecution arguments—that claim is procedurally defaulted, and, as Atkins does not show his appellate counsel to have been ineffective, he does not show cause and prejudice such as to overcome the procedural default. Furthermore, it is plain from Atkins' claim, and the authority he cites, that the claim was available before the Ninth Circuit Court of Appeals' decision in *Sechrest*; the timing of the decision in *Sechrest* does not amount to cause for Atkins' default of this claim. The Court will deny Atkins habeas corpus relief on Claim 10.

Claim 11 and the Related Part of Claim 13

In Claim 11, Atkins claims that his federal constitutional rights were violated because "the trial court gave an incorrect definition of reasonable doubt which lowered the State's burden of proof." Fourth Amended Petition (ECF No. 183), pp. 270–73. In Claim 13, Atkins claims that his counsel on his direct appeal was ineffective for not asserting the claim in Claim 11. *Id.* at 293–94.

The following instruction, Instruction No. 29, was given to the jury in the guilt phase of Atkins' trial:

> A reasonable doubt is one based on reason. It is not mere possible doubt but it is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison

and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable must be actual, not mere possibility or speculation.

Jury Instruction No. 29, Exh. 138 (ECF No. 91-48, p. 31). Atkins claims this instruction improperly lowered the State's burden of proof, and thereby violated his federal constitutional rights, and he claims that his appellate counsel was ineffective for not including this claim in his direct appeal.

Atkins did not assert the substantive claim on his direct appeal. *See* Appellant's Opening Brief, Exh. 181 (ECF No. 93-34). In his first state habeas action, Atkins asserted both the substantive claim and the claim that his appellate counsel was ineffective for not including the substantive claim in his direct appeal. *See* Supplemental Brief in Support of Petition, Exh. 232, pp. 51–53, 56–57 (ECF No. 94-13, pp. 52–54, 57–58); Appellant's Opening Brief, Exh. 256, pp. 61–62 (ECF No. 94-38, pp. 14–15).

The Nevada Supreme Court ruled the substantive claim procedurally barred because it was not raised on Atkins' direct appeal. *See* Order of Affirmance, Exh. 261, p. 1 n.2 (ECF No. 94-43, p. 2 n.2). The Nevada Supreme Court denied the claim of ineffective assistance of appellate counsel, on its merits, stating that it had repeatedly upheld such instructions against identical attacks. *See* Order of Affirmance, Exh. 261, pp. 8–9.

The Court determines that Atkins' claim that this jury instruction was unconstitutional under federal law is without substance. *See* Fourth Amended Petition (ECF No. 183), pp. 270–73; Reply ECF No. 222), pp. 195–98 (withdrawing part of claim). And, the Nevada Supreme Court's ruling that the instruction was proper under state law is authoritative and beyond the scope of this federal constitutional action. *See* *Bradshaw*, 546 U.S. at 76.

The Court, therefore, finds that the Nevada Supreme Court's ruling, denying Atkins' claim of ineffective assistance of appellate counsel, was reasonable; that ruling was not contrary to, or an unreasonable application of, Supreme Court precedent. The Court will deny the part of Claim 13 related to Claim 11 on that ground.

The substantive claim in Claim 11 will be denied as procedurally defaulted. As Atkins' appellate counsel was not ineffective for not asserting this claim on his direct appeal, Atkins does not show cause and prejudice for the procedural default.

<u>Claim 12 and the Related Part of Claim 13</u>

In Claim 12, Atkins claims that his federal constitutional rights were violated because "the definition of 'premeditation and deliberation' given [to Atkins'] jury was unconstitutional." Fourth Amended Petition (ECF No. 183), pp. 274–92. In the related part of Claim 13, Atkins claims that his counsel on his direct appeal was ineffective for not asserting the claim in Claim 12. *Id.* at 293–94.

Here, Atkins places at issue the so-called "*Kazalyn* instruction," a jury instruction approved by the Nevada Supreme Court in *Kazalyn v. State*, 108 Nev. 67, 825 P.2d 578 (1992), and *Powell v. State*, 108 Nev. 700, 838 P.2d 921 (1992), and disapproved by the same court eight years later in *Byford v. State*, 116 Nev. 215, 994 P.2d 700 (2000). The *Kazalyn* instruction, as given in the guilt phase of Atkins' trial, was as follows:

> Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing.
>
> Premeditation need not be for a day, an hour or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder.

Jury Instruction No. 7, Exh. 138 (ECF No. 91-48, p. 9). Atkins argues that this instruction was unconstitutional because it collapsed three elements of first-degree murder—"willful, deliberate and premeditated"—into one element: "premeditated."

Atkins did not assert any such claim on his direct appeal. *See* Appellant's Opening Brief, Exh. 181 (ECF No. 93-34). In his first state habeas action, Atkins asserted both the substantive claim and the claim that his appellate counsel was ineffective for not including the substantive claim in his direct appeal. *See* Supplemental Brief in Support of Petition, Exh. 232, pp. 47–50, 56–57 (ECF No. 94-13, pp. 48–51, 57–

58); Appellant's Opening Brief, Exh. 256, pp. 44–57 (ECF No. 94-37, pp. 60–65, and ECF No. 94-38, pp. 2–10).

The Nevada Supreme Court ruled the substantive claim procedurally barred because it was not raised on Atkins' direct appeal. *See* Order of Affirmance, Exh. 261, p. 1 n.2 (ECF No. 94-43, p. 2 n.2). The Nevada Supreme Court denied the claim of ineffective assistance of appellate counsel, on its merits, stating that it had repeatedly upheld such instructions against identical attacks. *See* Order of Affirmance, Exh. 261, pp. 8–9 (ECF No. 94-43, pp. 9–10).

In *Polk v.* Sandoval, 503 F.3d 903 (9th Cir. 2007), the Ninth Circuit Court of Appeals held that the *Kazalyn* instruction was unconstitutional because it relieved the State "of its burden of proving every element of first-degree murder beyond a reasonable doubt." Subsequently, however, in *Babb v. Lozowsky*, 719 F.3d 1019 (9th Cir. 2013), the court determined that its holding in *Polk* is no longer good law in light of the intervening ruling of the Nevada Supreme Court in *Nika v. State*, 124 Nev. 1272, 198 P.3d 839 (2008), that *Byford* represented a change, rather than a clarification, of Nevada law. *See Babb*, 719 F.3d at 1029. In light of *Nika* and *Babb*, it is now well-established that in cases in which the conviction became final after *Powell* but before *Byford*—that is, between 1992 and 2000—the *Kazalyn* instruction accurately stated Nevada law and did not violate the defendant's federal constitutional rights. *See Babb*, 719 F.3d at 1029–30; *see also Riley v. McDaniel*, 786 F.3d 719, 723–24 (9th Cir. 2015). Atkins' conviction became final on March 17, 1997, when the Supreme Court denied certiorari following the Nevada Supreme Court's order affirming his conviction. *See Colwell v. State*, 118 Nev. 807, 820, 59 P.3d 463, 472 (2002). Atkins' substantive claim is, therefore, foreclosed by *Babb.* The instruction was not unconstitutional.

It follows that the Nevada Supreme Court's ruling that Atkins' appellate counsel was not ineffective for not asserting this claim on his direct appeal was reasonable. Atkins does not show that ruling to be contrary to, or an unreasonable application of,

*Strickland*, or any other Supreme Court precedent. The Court will deny the part of Claim 13 related to Claim 12 on that ground.

The substantive claim in Claim 12 will be denied as procedurally defaulted. Because the claim is meritless, and because Atkins' appellate counsel was not ineffective for not asserting the claim on his direct appeal, Atkins does not show cause and prejudice relative to the procedural default.

Claim 13

In Claim 13, Atkins claims that his federal constitutional rights were violated as a result of ineffective assistance of his appellate counsel. Fourth Amended Petition (ECF No. 183), pp. 273–94. Atkins states: "Any purely-record-based claims or sub-claims discussed herein could and should have been raised on the direct appeal if the basis for them was entirely present in the record itself." *Id.* at 294.

In the September 28, 2017, order, on Respondents' motion to dismiss, the Court dismissed Claim 13 in part as follows:

> Respondents argue that this claim is barred by the statute of limitations. See Motion to Dismiss [ECF No. 192], pp. 19-20. Applying the principles discussed above, the Court finds that Claim 13 relates back to Atkins' original petition to the extent that Atkins claims his appellate counsel was ineffective for failing to raise, on his direct appeal, the following of the claims that appear in his fourth amended habeas petition in this case: Claims 1(a), 1(d), 1(e), 2, 3(a), 3(e), 3(f), 3(g), 3(i), 3(j), 4(a), 4(b), 4(g), 4(h), 5, 6, 7(a), 7(b), 7(c), 7(d), 7(e), 7(f), 9 (only the part of Claim 9 discussed in part (C)(iii) of Claim 9), 10, 11, 12, 14, 16, 17, 18, 19, 20, 21, 22, and 23. On the other hand, Claim 13 does not relate back to Atkins' original petition, is barred by the statute of limitations, and will be dismissed, to the extent that Atkins claims his appellate counsel was ineffective for failing to raise, on his direct appeal, the following of the claims in his fourth amended habeas petition in this case: Claims 1(b), 1(c), 3(b), 3(c), 3(d), 3(h), 4(c), 4(d), 4(e), 4(f), 8, 9 (except for the part of Claim 9 discussed in part (C)(iii) of Claim 9), 15, and 24.

Order filed September 28, 2017 (ECF No. 214), pp. 27–28; *see also id.* at 33.

Of the parts of Claim 13 not dismissed in the September 28, 2017, order, the following are claims of ineffective assistance of counsel or *Brady/Giglio* claims, are not "purely-record-based claims," and, as the Court understands Claim 13, these claims are

1
2

not incorporated into Claim 13: Claims 1(a), 1(d), 1(e), 2, 3(a), 3(e), 3(f), 3(g), 3(i), 3(j), 4(a), 4(b), 4(g), 4(h), 5 and 6.

3
4
5
6
7
8
9

Regarding Claim 13 as it relates to Claim 23—Atkins' claim that he may become incompetent to be executed—that claim is without merit. Atkins makes no showing that his appellate counsel performed unreasonably in not asserting such a claim on his direct appeal. That part of Claim 13 will be denied on the ground that the Nevada Supreme Court's denial of relief on the claim was reasonable. *See* Appellant's Opening Brief, Exh. 256, pp. 43–44, 66–67 (ECF No. 94-37, pp. 59–60, and ECF No. 94-38, pp. 19–20); Order of Affirmance, Exh. 261, pp. 3–4 (ECF No. 94-43, pp. 4–5).

10
11
12
13
14

Regarding the parts of Claim 13 not dismissed in the September 28, 2017, order, other than the part related to Claim 23—that is, the parts related to Claims 7(a), 7(b), 7(c), 7(d), 7(e), 7(f), 9C(iii), 10, 11, 12, 14, 16, 17, 18, 19, 20, 21 and 22—those parts of Claim 13 are discussed elsewhere in this order, in conjunction with the related underlying claims.

15

Claim 16 and the Related Part of Claim 13

16
17
18
19
20
21
22

In Claim 16, Atkins claims that "[t]he Nevada system of execution by lethal injection is unconstitutional." Fourth Amended Petition (ECF No. 183), pp. 300–05. As the Court understands Claim 16, Atkins assert that execution by lethal injection, conducted in the manner in which Nevada authorities intend to conduct it in his case, would be unconstitutional. *See id.* In the related part of Claim 13, Atkins claims that his counsel on his direct appeal was ineffective for not asserting, on his direct appeal, the claim in Claim 16. *Id.* at 293–94.

23
24
25
26
27
28

Such a challenge to Nevada's protocol for carrying out a death sentence is not cognizable in this federal habeas corpus action. In *Nelson v. Campbell*, 541 U.S. 637 (2004), a state prisoner sentenced to death filed a civil rights action, under 42 U.S.C. § 1983, alleging that the state's proposed use of a certain procedure, not mandated by state law, to access his veins during a lethal injection would constitute cruel and unusual punishment. The Supreme Court reversed the lower courts' ruling that the claim

sounded in habeas corpus and could not be brought as a Section 1983 action. The Supreme Court ruled that Section 1983 was an appropriate vehicle for the prisoner to challenge the lethal injection procedure prescribed by state officials. *Nelson*, 541 U.S. at 645. The Court stated that the prisoner's suit challenging "a particular means of effectuating a sentence of death does not directly call into question the 'fact' or 'validity' of the sentence itself [because by altering the lethal injection procedure] the State can go forward with the sentence." *Id.* at 644. In *Hill v. McDonough*, 547 U.S. 573 (2006), the Court reaffirmed the principles articulated in *Nelson*, ruling that an as-applied challenge to lethal injection was properly brought by means of a Section 1983 action. *Hill*, 547 U.S. at 580–83.

*Nelson* and *Hill* suggest that a Section 1983 action is the more appropriate vehicle for such a challenge to a method of execution. *See also Glossip v. Gross*, 135 S.Ct. 2726, 2738 (2015) ("In *Hill*, the issue was whether a challenge to a method of execution must be brought by means of an application for a writ of habeas corpus or a civil action under § 1983. We held that a method-of-execution claim must be brought under § 1983 because such a claim does not attack the validity of the prisoner's conviction or death sentence." (citations to *Hill* omitted)); *Beardslee v. Woodford*, 395 F.3d 1064, 1068–69 (9th Cir. 2005) (holding that claim that California's lethal injection protocol violated Eighth Amendment "is more properly considered as a 'conditions of confinement' challenge, which is cognizable under § 1983, than as a challenge that would implicate the legality of his sentence, and thus be appropriate for federal habeas review").

Given the amount of time that passes before a death sentence is carried out, it is certainly possible—perhaps likely—that a state's execution protocol will change between the time when a death sentence is imposed and the time when it is carried out. In this regard, the Court notes that Atkins bases his claim on "the Nevada Department of Corrections April 2006 execution manual," without any citation to that manual and apparently without submitting a copy of it as an exhibit. *See* Fourth Amended Petition

(ECF No. 183), p. 300. Habeas corpus law and procedure have not developed and are unsuited to adjudicate the constitutionality of an execution protocol that may change after a court imposes the death sentence. The Court concludes that a challenge to a state's execution protocol is not a challenge to the constitutionality of the petitioner's custody or sentence. *See* 28 U.S.C. § 2254. A challenge to a state's execution protocol is more akin to a suit challenging the conditions of custody, which must be brought as a civil rights action under 42 U.S.C. § 1983. Claim 16 will be denied as not cognizable in this federal habeas corpus action.

Turning to Atkins' claim, in Claim 13, that his appellate counsel was ineffective for not asserting a claim like Claim 16 on his direct appeal, Atkins asserted such a claim in his petition in his first state habeas action. *See* Supplemental Brief in Support of Petition, Exh. 232, pp. 56–57, 78–82 (ECF No. 94-13, pp. 57–58, 79–83). The state district court denied the claim. *See* Findings of Fact, Conclusions of Law and Order, Exh. 237, pp. 37–38 (ECF No. 94-18, pp. 38–39). However, Atkins then apparently abandoned the claim in that action; he did not assert such a claim on his appeal. *See* Appellant's Opening Brief, Exh. 256 (ECF No. 94-37). As such, the claim is procedurally defaulted, and Atkins does not make any showing of cause and prejudice to overcome the procedural default. This claim of ineffective assistance of appellate counsel will be denied as procedurally defaulted.

Claim 17 and the Related Part of Claim 13

In Claim 17, Atkins claims that his "sentence is unconstitutional due to the failure of the Nevada Supreme Court to conduct fair and adequate appellate review." Fourth Amended Petition (ECF No. 183), pp. 306–08. The gist of Atkins' claim in Claim 17 is that the Nevada Supreme Court did not adequately conduct its review of his case under NRS 177.055(2), which, among other things, requires the state appellate court to review capital cases to determine: "[w]hether the evidence supports the finding of an aggravating circumstance or circumstances;" "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor"; and

1  "[w]hether the sentence of death is excessive, considering both the crime and the

2  defendant." NRS 177.055(2). In the related part of Claim 13, Atkins claims that his

3  appellate counsel was ineffective for not asserting such a claim on his direct appeal. *Id.*

4  at 293–94.

5  　　Atkins did not assert the substantive claim in Claim 17 on his direct appeal. *See*

6  Appellant's Opening Brief, Exh. 181 (ECF No. 93-34). Atkins did assert these claims in

7  his petition in his first state habeas action. *See* Supplemental Brief in Support of

8  Petition, Exh. 232, pp. 56–57, 59–61 (ECF No. 94-13, pp. 57–58, 60–61). The state

9  district court denied relief. *See* Findings of Fact, Conclusions of Law and Order, Exh.

10  237 (ECF No. 94-18). Then, it appears that Atkins abandoned these claims, as he did

11  not raise them on his appeal. *See* Appellant's Opening Brief, Exh. 256 (ECF No. 94-37).

12  　　Therefore, these claims are procedurally defaulted. The Court finds the

13  substantive claim to be without merit; Atkins does not make any colorable showing that

14  the evidence did not support the finding of an aggravating circumstance, that his death

15  sentence was imposed under the influence of passion, prejudice or any arbitrary factor,

16  or that his death sentence is excessive. Atkins does not make any showing that the

17  Nevada Supreme Court did not adequately conduct the review required by

18  NRS 177.055(2). Atkins does not point to any federal authority supporting his contention

19  that his federal constitutional rights were violated as he claims. Atkins does not show

20  cause and prejudice with respect to either the substantive claim or the claim of

21  ineffective assistance of appellate counsel. Both Claim 17 and the related part of Claim

22  13 will be denied as procedurally defaulted.

23  　　<u>Claim 18 and the Related Part of Claim 13</u>

24  　　In Claim 18, Atkins claims that his death sentence is in violation of the federal

25  constitution because "the Nevada capital punishment system is arbitrary and

26  capricious." Fourth Amended Petition (ECF No. 183), pp. 309–11. Atkins makes several

27  general allegations regarding the operation of the Nevada death penalty system and

28  contends that, as a result of the shortcomings he alleges, it is constitutionally defective.

1     *See id.* In the related part of Claim 13, Atkins claims that his appellate counsel was

2     ineffective for not asserting a claim such as this on his direct appeal. *Id.* at 293–94.

3          Atkins did not assert the substantive claim in Claim 18 on his direct appeal. *See*

4     Appellant's Opening Brief, Exh. 181 (ECF No. 93-34). Atkins did assert both the

5     substantive claim and the claim of ineffective assistance of appellate counsel in his first

6     state habeas action. *See* Supplemental Brief in Support of Petition, Exh. 232, pp. 56–

7     57, 75–78 (ECF No. 94-13, pp. 57–58, 76–79). The state district court denied relief on

8     the claims. *See* Findings of Fact, Conclusions of Law and Order, Exh. 237 (ECF No. 94-

9     18). Atkins then asserted these claims on the appeal in that state habeas action. *See*

10    Appellant's Opening Brief, Exh. 256, pp. 66–67, 71–73 (ECF No. 94-38, pp. 19–20, 24–

11    26). The Nevada Supreme Court ruled the substantive claim procedurally barred, and

12    ruled as follows on the claim of ineffective assistance of Atkins' appellate counsel:

13            ... Atkins contends that his appellate counsel was ineffective for

14        failing to challenge ... Nevada's death penalty statutory scheme in
particular.... [T]his court has repeatedly upheld Nevada's death penalty

15        scheme against similar challenges. [Footnote: *See*, *e.g.*, *Gallego v. State*,
117 Nev. ___, ___, 23 P.3d 227, 242 (2001); *Leonard v. State*, 117 Nev.

16        ___, ___, 17 P.3d 397, 416 (2001); *Middleton v. State*, 114 Nev. 1089,
1116–17, 968 P.2d 296, 314–15 (1998).] .... Accordingly, Atkins' appellate

17        counsel was not ineffective for failing to raise these issues.

18    Order of Affirmance, Exh. 261, p. 10 (ECF No. 94-43, p. 11); *see also id.* at 1 n.2 (ECF

19    No. 94-43, p. 1 n.2) ("To the extent that Atkins raises independent constitutional

20    claims, they are waived because they were not raised on direct appeal. *See*

21    NRS 34.810(1)(b).").

22          The Nevada Supreme Court's ruling on Atkins' claim of ineffective assistance of

23    his appellate counsel is reasonable. Atkins' underlying claim is insubstantial. He does

24    not show Nevada's death penalty system to be unconstitutional, and, at any rate, he

25    makes no attempt to show that he was prejudiced. Atkins' appellate counsel did not

26    perform unreasonably in not asserting this claim on his direct appeal. The Court will

27    deny the claim of ineffective assistance of appellate counsel, affording the state court

28

1    ruling the deference mandated by 28 U.S.C. §2254(d), and will deny the underlying

2    substantive claim as procedurally defaulted.

3            Claim 19 and the Related Part of Claim 13

4            In Claim 19, Atkins claims that his death sentence is in violation of the federal

5    constitution because "the death penalty is cruel and unusual punishment." Fourth

6    Amended Petition (ECF No. 183), pp. 312–13. In this claim, Atkins contends that "the

7    death penalty is cruel and unusual punishment in all circumstances." *See id.* In the

8    related part of Claim 13, Atkins claims that his appellate counsel was ineffective for not

9    asserting a claim such as this on his direct appeal. *Id.* at 293–94.

10           Atkins did not assert the substantive claim in Claim 19 on his direct appeal. *See*

11   Appellant's Opening Brief, Exh. 181 (ECF No. 93-34). Atkins asserted both the

12   substantive claim and the claim of ineffective assistance of appellate counsel in his first

13   state habeas action. *See* Supplemental Brief in Support of Petition, Exh. 232, pp. 56–

14   57, 78–79 (ECF No. 94-13, pp. 57–58, 79–80). The state district court denied relief on

15   the claims. *See* Findings of Fact, Conclusions of Law and Order, Exh. 237 (ECF No. 94-

16   18). Atkins then asserted these claims on the appeal in that state habeas action. *See*

17   Appellant's Opening Brief, Exh. 256, pp. 66–67, 73–74 (ECF No. 94-38, pp. 19–20, 26–

18   27). The Nevada Supreme Court ruled the substantive claim procedurally barred, and

19   ruled as follows on the claim of ineffective assistance of Atkins' appellate counsel:

20           ... Atkins contends that his appellate counsel was ineffective for
         failing to challenge the constitutionality of the death penalty in general....
21       [W]e reject Atkins' underlying constitutional challenges to the death
         penalty in general. We have repeatedly upheld the general
22       constitutionality of the death penalty under the Eighth Amendment and the
         Nevada Constitution. [Footnote: *See, e.g., Colwell v. State*, 112 Nev. 807,
23       814–15, 919 P.2d 403, 407–08 (1996); *Bishop v. State*, 95 Nev. 511, 517–
         18, 597 P.2d 273, 276–77 (1979).] .... Accordingly, Atkins' appellate
24       counsel was not ineffective for failing to raise these issues.

25   Order of Affirmance, Exh. 261, p. 10 (ECF No. 94-43, p. 11); *see also id.* at 1 n.2 (ECF

26   No. 94-43, p.1 n.2).

27           The Nevada Supreme Court's ruling on Atkins' claim of ineffective assistance of

28   his appellate counsel is reasonable. Atkins' underlying claim is foreclosed by United

States Supreme Court precedent. *See Glossip v. Gross*, 135 S.Ct. 2726, 2739 (2015);

*Baze v. Rees*, 553 U.S. 35, 47 (2008); *Gregg v. Georgia*, 428 U.S. 153, 187 (1976).

Atkins' appellate counsel did not perform unreasonably in not asserting this claim on his

direct appeal. The Court will deny the claim of ineffective assistance of appellate

counsel, affording the state court ruling the deference mandated by 28 U.S.C. §2254(d),

and will deny the underlying substantive claim as procedurally defaulted.

<u>Claim 20 and the Related Part of Claim 13</u>

In Claim 20, Atkins claims that his "conviction and sentence violate international

law and the International Covenant on Civil and Political Rights." Fourth Amended

Petition (ECF No. 183), p. 314. In the related part of Claim 13, Atkins claims that his

appellate counsel was ineffective for not asserting a claim such as this on his direct

appeal. *Id.* at 293–94.

Atkins did not assert the substantive claim in Claim 19 on his direct appeal. *See*

Appellant's Opening Brief, Exh. 181 (ECF No. 93-34). Atkins asserted both the

substantive claim and the claim of ineffective assistance of appellate counsel in his first

state habeas action. *See* Supplemental Brief in Support of Petition, Exh. 232, pp. 56–

57, 83–84 (ECF No. 94-13, pp. 57–58, 84–85). The state district court denied relief on

the claims. *See* Findings of Fact, Conclusions of Law and Order, Exh. 237 (ECF No. 94-

18). Atkins then asserted these claims on the appeal in that state habeas action. *See*

Appellant's Opening Brief, Exh. 256, pp. 66–67, 74–75 (ECF No. 94-38, pp. 19–20, 27–

28). The Nevada Supreme Court ruled the substantive claim procedurally barred, and

ruled as follows on the claim of ineffective assistance of Atkins' appellate counsel:

> ... Atkins contends that his appellate counsel failed to argue that
> Atkins' conviction and sentence are invalid pursuant to the rights and
> protections afforded him under the International Covenant on Civil and
> Political Rights ("ICCPR"), a treaty ratified by the United States Senate in
> 1992. [Footnote: *See* ICCPR, opened for signature Dec. 19, 1966,
> U.N.T.S. 171.] Atkins alleges that the Covenant provides any person
> charged with a criminal offense a number of guarantees, which he lists.
> Atkins then concludes that all of the listed guarantees "were violated in his
> case, and are pleaded elsewhere throughout this petition." It is Atkins'
> responsibility to present relevant authority and cogent argument, and we
> need not address issues that are not so presented. [Footnote: *Maresca v.*

1
2

*State*, 103 Nev. 669, 673, 748 P.2d P.2d 3, 6 (1987); *see generally*, *Hargrove v. State*, 100 Nev. 498, 686 P.2d 222 (1984).] On this basis, we conclude that Atkins is not entitled to relief on this claim.

3

Order of Affirmance, Exh. 261, p. 14 (ECF No. 94-43, p. 15); *see also id.* at 1 n.2 (ECF

4

No. 94-43, p. 1 n.2).

5

The Nevada Supreme Court's ruling on Atkins' claim of ineffective assistance of

6

his appellate counsel is reasonable. Atkins did not present authority or argument

7

supporting a claim that he is entitled to habeas relief on this ground. Atkins does not

8

demonstrate that the International Covenant on Civil and Political Rights creates rights

9

enforceable in state or federal court. Atkins' appellate counsel did not perform

10

unreasonably in not asserting this claim on his direct appeal. The Court will deny the

11

claim of ineffective assistance of appellate counsel, affording the state court ruling the

12

deference mandated by 28 U.S.C. §2254(d), and will deny the underlying substantive

13

claim as procedurally defaulted.

14

Claim 21 and the Related Part of Claim 13

15

In Claim 21, Atkins claims that his death sentence is in violation of the federal

16

constitution because "the execution of a death sentence after keeping the condemned

17

on death row for an inordinate amount of time constitutes cruel and unusual

18

punishment." Fourth Amended Petition (ECF No. 183), pp. 315–20. In the related part of

19

Claim 13, Atkins claims that his appellate counsel was ineffective for not asserting a

20

claim such as this on his direct appeal. *Id.* at 293–94.

21

The Court determines that this claim is barred by the statute of limitations. In the

22

order filed September 28, 2017, on Respondents' motion to dismiss, the Court deferred

23

ruling on this statute of limitations issue, citing 28 U.S.C. § 2244(d) and noting that "the

24

factual predicate for this claim—that 'the execution of a death sentence after keeping

25

the condemned on death row for an inordinate amount of time constitutes cruel and

26

unusual punishment'—could arguably have arisen within a year before Atkins filed his

27

fourth amended petition." Order filed September 28, 2017 (ECF No. 214), p. 29, quoting

28

Fourth Amended Petition (ECF No. 183), p. 315. In his Reply, Atkins' argument on this

point, in its entirety, is as follows: "Prior to the filing of the fourth amended petition, Atkins had not been on death row for an inordinate amount of time and raising it now was his first practical opportunity to do so." Reply (ECF No. 222), p. 242. The Court disagrees. Atkins was convicted, and the death penalty was imposed, on June 8, 1995. *See* Judgment of Conviction, Exh. 159 (ECF No. 92-21). Justice Stevens' statement respecting the denial of certiorari in *Lackey v. Texas*, 514 U.S. 1045, 1045 (1995), articulating the arguable basis for a claim such as this, was published just months before, on March 27, 1995. In *Lackey*, the petitioner had been on death row for some 17 years. *See Lackey*, 514 U.S. at 1045. Twelve years after Atkins' conviction, on December 10, 2007, Atkins filed his first amended petition (ECF No. 69), thirteen years after his conviction, on October 29, 2008, Atkins filed his second amended petition (ECF No. 85), and fifteen years after his conviction, on April 13, 2010, Atkins filed his third amended petition (ECF No. 117); Atkins did not include in any of those amended petitions a claim like that in Claim 21. The Court determines that the factual predicate, and legal underpinnings, for the claim were available prior to one year before Atkins filed his fourth amended petition on August 26, 2016 (ECF No. 183). Claim 21 and the related claim of ineffective assistance of appellate counsel in Claim 13 are barred by the statute of limitations and will be denied primarily on that ground.

Furthermore, both Claim 21 and the related part of Claim 13 are procedurally defaulted, and they will be denied on that alternative ground as well. Atkins concedes that he never raised this claim in any court before he filed his fourth amended petition in this case. *See* Reply (ECF No. 222), p. 242. Atkins does not demonstrate cause and prejudice to overcome the procedural default of either claim.

The Court will deny Atkins habeas corpus relief with respect to Claim 21 and the related part of Claim 13.

Claim 22 and the Related Part of Claim 13

Claim 22 of Atkins' fourth amended petition is a cumulative error claim; that is, in Claim 22, Atkins incorporates his other claims, and asserts that, considered

90

cumulatively, the errors alleged in his other claims warrant federal habeas corpus relief. *See* Fourth Amended Petition (ECF No. 183), pp. 321–23. In the related part of Claim 13, Atkins claims that his appellate counsel was ineffective for not asserting such a claim on his direct appeal. *Id.* at 293–94.

The Court has identified no constitutional error, and therefore finds there to be no error to consider cumulatively. The Court will deny Atkins habeas corpus relief with respect to Claim 22.

The Court determines, further, that the Nevada Supreme Court reasonably denied Atkins relief on his cumulative error claim in state court. The Court affords that ruling deference under 28 U.S.C. § 2254(d) and will deny Atkins relief on the part of Claim 13 related to Claim 22.

Motion for Evidentiary Hearing

Atkins has filed a motion for an evidentiary hearing (ECF No. 168). Respondents filed an opposition to that motion (ECF No. 23). Atkins did not reply.

In his motion for evidentiary hearing, Atkins requests an evidentiary hearing regarding his argument that he can overcome the procedural default of many of his claims by showing his actual innocence under *Schlup v. Delo*, 513 U.S. 298 (1995). In the September 28, 2017, order, the Court found Atkins' *Schlup* argument unavailing, without need for an evidentiary hearing. *See* Order filed September 28, 2107 (ECF No. 214), pp. 13–16, 31. The Court will not revisit that ruling here.

Atkins also requests an evidentiary hearing regarding all his claims of ineffective assistance of counsel. Atkins makes this request generally, without identifying any particular questions of fact on which an evidentiary hearing is warranted, and without giving any indication why an evidentiary hearing is called for with regard to any such questions of fact. Atkins does not identify what witnesses he would call to testify, or what other evidence he would seek to present, regarding any particular factual question. The Court determines there to be no need for an evidentiary hearing on any of the

claims resolved in this order, and the Court will not grant Atkins an evidentiary hearing based on the generalized motion he has presented.

The Court will deny Atkins' motion for an evidentiary hearing.

Certificate of Appealability

The standard for the issuance of a certificate of appealability requires a "substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c). The Supreme Court has interpreted 28 U.S.C. § 2253(c) as follows:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. The issue becomes somewhat more complicated where, as here, the district court dismisses the petition based on procedural grounds. We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077–79 (9th Cir. 2000).

Applying the standard articulated in *Slack*, the Court finds that a certificate of appealability is warranted with respect to Claims 4(b), 4(g), 4(h), 10, and the part of Claim 13 related to Claim 10. The Court will grant Atkins a certificate of appealability with regard to those claims. With regard to the remainder of Atkins' claims, the Court will deny him a certificate of appealability.

Conclusion

**IT IS THEREFORE ORDERED** that the Petitioner's Fourth Amended Petition for Writ of Habeas Corpus (ECF No. 183) is **DENIED**.

**IT IS FURTHER ORDERED** Petitioner's Motion for Evidentiary Hearing (ECF No. 223) is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner is granted a certificate of appealability with respect to Claims 4(b), 4(g), 4(h), 10, and the part of Claim 13 related to Claim 10,

of his Fourth Amended Petition for Writ of Habeas Corpus (ECF No. 183). With respect to all other claims, the Court denies a certificate of appealability.

**IT IS FURTHER ORDERED** that the Clerk of the Court is directed to enter judgment accordingly.

DATED July 10, 2020.

JAMES C. MAHAN,
UNITED STATES DISTRICT JUDGE